392 F.2d 255
 Roscoe L. NORMAN
v.
The UNITED STATES.
John E. CROWLEY
v.
The UNITED STATES.
Sherwood E. BUCKLAND
v.
The UNITED STATES.
Maurice J. FITZGERALD
v.
The UNITED STATES.
Loren E. BUCKEY
v.
The UNITED STATES.
John B. MARTIN
v.
The UNITED STATES.
 Nos. 295-62.
 Nos. 321-62.
 Nos. 336-62.
 Nos. 256-64.
 Nos. 351-64.
 Nos. 313-64.
 United States Court of Claims.
 March 15, 1968.
 
 Richard L. Merrick, Joliet, Ill., attorney of record, for plaintiffs Roscoe L. Norman, John E. Crowley, Sherwood E. Buckland, Maurice J. Fitzgerald and Loren E. Buckey.
 Clifford A. Dougherty, Arlington, Va., attorney of record, for plaintiff John B. Martin.
 Charles M. Munnecke, Washington, D. C., with whom was Asst. Atty. Gen. Edwin L. Weisl, Jr., for defendant.
 Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, SKELTON and NICHOLS, Judges.
 OPINION
 DURFEE, Judge.
 
 
 1
 Each of the plaintiffs herein seeks to recover the difference between the active duty pay he would have received as an officer in the Air Force if he had not been retired early under the provisions of the so-called White Charger Act and the retired pay he has received since the date of his retirement under that Act. We conclude that none of the plaintiffs is entitled to recover.
 
 
 2
 The "White Charger Act"[1] derived its name from an observation that this legislation went through Congress "like a White Charger." The Act permitted early mandatory retirement of not to exceed 20 percent of officers in the military service in the grade of permanent colonel and an unlimited number of permanent colonels with 20 years or more of service who had been considered for promotion twice, but not recommended.
 
 
 3
 The Act took initial form in Senate Bill S. 1795 which was the outgrowth of proposed legislation submitted by the Secretary of Defense who explained its purpose to the Congress on April 20, 1959:
 
 
 4
 The purpose of the proposed legislation is to enable the Armed Forces to meet more effectively the objective of a Regular officer corps of the highest quality in all ranks by (1) more closely relating the retention of officers after 20 years of service who are serving in the permanent grades of lieutenant colonel and colonel, commander and captain to the requirements of the services, including the degree of contribution or productivity of the officer and the needs of the services rather than solely to a "guaranteed" number of years of service; (2) according increased recognition and incentive for outstanding ability and competence; * * * and (4) expediting the separation from the service of officers who have been twice deferred from permanent promotion. [Emphasis supplied]
 
 
 5
 * * * * * *
 
 
 6
 It is emphasized that the present legislation is not intended to cause, and will not be used for, the involuntary removal of Regular officers from the active list solely because of a reduction in the actual or authorized personnel strength of the service concerned. Rather it is intended that the removal of Regular officers from the active list will continue to be authorized only for the reasons and under the procedures and limitations now provided by law for such removal and as further provided by the proposed legislation. [Emphasis supplied]
 
 
 7
 The need "to meet more effectively the objective of a Regular officer corps of the highest quality in all ranks" arose from the sudden expansion of the Regular officer corps in World War II, and again during the Korean War. The law as finally enacted was limited to the Army and the Air Force, but the principal problem of quality of service by senior officers resulted mainly from the rapid expansion in the number of Air Force officers during wartime. For example, the Regular Air Force officer corps was increased from 1,400 at the time of our entry into World War II to 23,000 after World War II and to 69,000 in 1956 after the hostilities in Korea.
 
 
 8
 As a result of this expansion, many officers were promoted rapidly for the purpose of staffing the increased number of higher grade positions. Some officers were promoted to the grade of colonel in the Air Force with 12 or 13 years of service, 10 years before they would have reached that grade in the Army or Navy. As a consequence of this rapid promotion, however, these Air Force senior officers faced many years of service in their attained rank with severely limited prospects of further promotion.
 
 
 9
 Under the Officer Personnel Act of 1947[2] lieutenant colonels could expect to continue in active service until they had completed 28 years of service (61 Stat. 905); this same expectation of continued service for colonels was until completion of 30 years of service (61 Stat. 904). During the middle of the 1950's responsible officials of the Air Force became concerned as to the quality of service of some of these senior officers in view of new and increasing requirements, and the fact that the existing law provided a sanctuary in long continued active service in grade for them.
 
 
 10
 Mandatory elimination by separation or retirement of deferred officers of the Army in junior grades who failed of selection for promotion, was provided by this Act of 1947. However, the only method for the elimination of officers of the grade of lieutenant colonel and colonel was for demonstrated deficiency in performance of such degree as to warrant elimination through show cause procedures, which had been largely ineffective. When used, this method had the colorable effect of stigmatizing subject officers. In April, 1956, the Deputy Chief of Personnel of the Air Force, in reviewing this problem, stated:
 
 
 11
 The 1946 and 1947 integration program increased the Regular Officer corps to 17,500. * * *
 
 
 12
 As a result, the age and experience of 12,000 of our Regular officers is concentrated in the five year bracket of officers commissioned from 1941 through 1945.
 
 
 13
 * * * * * *
 
 
 14
 With as many of our regular officers concentrated in this five year group, and with only a limited number of spaces available for promotion to permanent colonel, junior officers of this group would be mandatorily retired as lieutenant colonel without ever competing for promotion to permanent colonel.
 
 
 15
 In light of this, a plan was developed in 1953 and has been in use since 1955 which will assure every Regular Air Force Officer at least two opportunities for permanent promotion to colonel before he is mandatorily retired.
 
 
 16
 * * * * * *
 
 
 17
 Since the great majority of the eligible officers are all well qualified for promotion, the board soon realizes that in reality, they are selecting the best of the best qualified.
 
 
 18
 * * * * * *
 
 
 19
 In this situation non-selection reflects in no way upon the individual qualifications of the officers concerned or the Air Force's continued reliance on and the need for their services. [Emphasis supplied]
 
 
 20
 All of the foregoing considerations were included in the Report to the Secretary of Defense by an advisory group known as the Cordiner Committee on Professional and Technical Compensation in 1957. This Committee noted "the Military Manpower Problem" as follows:
 
 
 21
 The modern military manpower problem, reduced to its simplest terms is one of quality rather than quantity. It is not merely a matter of the total number of people on hand, but is much more a matter of the level of competence, skill and experience of those people.
 
 
 22
 * * * * * *
 
 
 23
 (8) As retention of quality military personnel improves, revitalize existing personnel controls and institute new controls to accomplish the following:
 
 
 24
 * * * * * *
 
 
 25
 A stiffening of the criteria of selection for promotion and retention to insure the retention and advancement in all grades of only the highly qualified.
 
 
 26
 * * * * * *
 
 
 27
 As an example of the type of problem facing the Services in this area, there exists within each of the Services a small group of officers in grades 0-5 and 0-6 for whom this safeguard has served a purpose for which it was not intended. Having failed of selection for promotion and being in the sanctuary of this provision, these officers have not continued to produce with customary effectiveness. * *
 
 
 28
 The Committee, however, is convinced that "quality attracts quality." Therefore, a positive requirement exists for each Service to employ all administrative and legislative measures now available to them to separate from active duty the less productive officers within its officer corps. The Committee recommends that additional remedial Service legislation should be sought if found necessary in the establishment of effective personnel quality controls.
 
 
 29
 As a result of careful and thorough consideration of these considerations by Congress, Public Law 86-616, 74 Stat. 386, was enacted, and approved on July 12, 1960. In relevant part, it provided [Id. at 395]:
 
 
 30
 (a) Not more than once in each fiscal year, the Secretary of the Army and the Secretary of the Air Force may convene one or more boards, each consisting of at least five officers * * * in a grade above colonel, to review the records of, and recommend for continuation on the active list, officers * * * in the regular grade of colonel or lieutenant colonel who have at least 20 years of service * * * and who have been considered more than twice but not recommended for promotion to the next higher regular grade.
 
 
 31
 (b) A board convened under this section shall recommend officers for continuation on the active list in the number specified by the Secretary. The Secretary may specify separate numbers for particular categories of officers. However, except with respect to the first board * * *, the number specified by him for officers in any category must be at least 80 percent of the officers in that category being considered. An officer may be considered for continuation on the active list * * * only once while serving in the regular grade of colonel and only once while serving in the regular grade of lieutenant colonel.
 
 
 32
 (c) * * * [I]f the Secretary approves the report of a board, he shall, not later than the first day of the seventh * * * month * * * retire each officer who is considered but not recommended for continuation.
 
 
 33
 (d) A member * * * retired under this section is entitled to retired pay * * *.
 
 
 34
 (e) * * *
 
 
 35
 (f) This section is not effective after June 30, 1965.
 
 
 36
 We shall first deal with the legality of the Act itself.
 
 
 37
 Plaintiffs assert that Section 10 of the Act of 1960 is unconstitutional and void because it deprives them and other officers similarly situated of valuable rights without due process of law; is arbitrary and discriminatory, and also constitutes an unlawful delegation of legislative powers because no adequate standards are prescribed for the exercise of administrative discretion in making the determination by which regular officers are to be continued on the active list, or to be retired or discharged.
 
 
 38
 First we take up plaintiffs' claim that they were deprived of a vested right without due process of law. The alleged vested or property right is claimed by plaintiffs on the basis that they were appointed to permanent grades in the Air Force, and therefore held by statute, office with tenures fixed at 28 years for lieutenant colonels and 30 years for colonels, with vested rights to remain on duty for these periods unless retired earlier for physical disability or by other existing provision of law. Accordingly, plaintiffs urge that they could not legally be deprived of these vested rights except by due process of law. Plaintiffs charge that their removal without hearings, right of cross examination, confrontation or challenge as authorized under the Act, is a violation of due process and therefore unconstitutional and void.
 
 
 39
 The principle is well established that there is no vested right to Federal employment or to the privileges of retirement thereby. The status of these officers was not a common law contractual relationship with the Government, but was created entirely by statute and could be altered or taken away by statute. Bell v. United States, 366 U.S. 393, 81 S.Ct. 1230, 6 L.Ed.2d 365 (1961). This rule in Bell, supra, although dictum, became part of the basis for a clear holding by this court in Andrews et al. v. United States, 175 Ct.Cl. 561 (1966). Plaintiffs there were challenging the validity of a statute (Uniformed Services Pay Act of 1963, 77 Stat. 210) which denied them their "right" to compute their retirement pay at 75 percent of present active duty pay. The statutory right to retirement pay had allegedly vested by virtue of the fact that plaintiffs had given the Government the bargained-for consideration, viz., performance in the Armed Services for the required number of years. Our court rejected this claim of a vested or contractual right to any particular amount of retired pay under statute (175 Ct.Cl. at p. 563):
 
 
 40
 * * * Under the plaintiffs' theory, both the 1958 and the 1963 Acts breach the contract and, therefore, are unconstitutional under the Fifth Amendment.
 
 
 41
 The difficulty with this position, as defendant points out, is that there is strong authority for the counterproposition that officers have no vested or contractual right to any particular amount of retired pay. The general rule has long been that "[a] soldier's entitlement to pay is depending upon statutory right * * * [and not upon] common-law rules governing private contracts * * *."
 
 
 42
 [Citations of authority[3]]. And since the pay of officers in the uniformed services is within the exclusive control of Congress, it was free to limit the benefits of the 1958 active duty pay increase to members on the active duty list.
 
 
 43
 We hold that this same general rule is applicable to the present case.
 
 
 44
 As a further ground for challenge of the constitutionality of the Act, plaintiffs urge that the Act is unconstitutional because no standards were therein provided for exercise of the legislative discretion delegated by Congress to the Secretary of the Air Force to retire the lieutenant colonels and colonels here involved before completion of their statutory terms of 28 and 30 years respectively.
 
 
 45
 The trial commissioner in his findings, which we adopt, has set forth in detail the full and extensive information and explanation of the background and purpose of this legislation presented to the Congress by the Cordiner Committee and the Department of Defense. Extensive hearings were conducted by the appropriate committees of the Congress, and it is clear that Congress fully understood the action that it was taking and the consequences thereof to the officers who could be retired under this legislation. Whatever the "White Charger" catch name may imply, it is a misnomer if it implies hasty or ill-considered action by Congress.
 
 
 46
 The objective of Bill S. 1795 as finally enacted was made abundantly clear to the Congress through the reports of hearings and the Committee reports. The Senate Committee on Armed Services in its Report No. 571, 86th Cong., 1st Sess., stated:
 
 
 47
 The basic purpose of this bill is to provide certain "quality control" authority for the management of regular officer personnel in the military departments. [p. 2]
 
 
 48
 * * * * * *
 
 
 49
 * * * The Bill in effect provides discretionary authority whereby officers in these two grades who failed at least twice for promotion to permanent rank could be selectively retired prior to completing the full 28 or 30 years respectively. [p. 2]
 
 
 50
 * * * * * *
 
 BACKGROUND
 
 51
 The proposed legislation stems from the studies and recommendations of the Cordiner Committee. That Committee stressed the need for additional authority for involuntary retirement of officers in the permanent grades of lieutenant colonel, colonel, and equivalent ranks, whose performance of duty did not measure up to the high quality standards required. Further, the Committee has urged that in light of the substantial increases in pay for the higher grades there should be a corresponding emphasis on measures to insure that only officers of the highest quality and potential were promoted to and retained in these higher grades. [p. 3] [Emphasis supplied]
 
 
 52
 * * * * * *
 
 
 53
 It is the view of the Department of Defense that this legislation does not constitute a breach of faith with respect to officers who might consider themselves adversely affected by its provisions. The military services over many years have sought and obtained changes in the laws regarding their personnel policies with a view toward improving the forces and of meeting changing times and conditions. Changes have been made over a number of years in both the retirement systems and the promotion systems in order to meet the needs of the services. * * * [p. 9]
 
 
 54
 The House Committee's Report No. 1406, 86th Congress, 2d Sess., concludes:
 
 
 55
 Within the framework of existing law, the military services have been and are now vigorously carrying out sound, progressive, personnel programs and administrative measures designed to make career service more attractive and to improve further the quality of the career officer structure. Measurable progress has resulted from these programs and every effort will be continued to consolidate and improve the gains already made.
 
 
 56
 The [sic] remains, however, a need for added flexibility in some of the statutory provisions presently controlling the promotion, retention, and involuntary retirement of Regular officers. [p. 16]
 
 
 57
 With these considerations clearly before the Congress, it specifically gave the Secretary authority to convene boards to review the records of and recommend for continuation on the active list in numbers specified by the Secretary, colonels or lieutenant colonels who have at least 20 years of service, and who have been considered more than twice, but not recommended for promotion to the next higher grade. However, with respect to the first board, the number specified by the Secretary for continuation in active servive must be at least 80 percent of the officers in the category being considered. Such officers could be considered only once under this section of the Act.
 
 
 58
 The two leading cases advanced in support of plaintiffs' contention are Panama Refining Co. et al. v. Ryan, 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446 (1935) and A. L. A. Schechter Poultry Corp. et al. v. United States, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 (1935). The rule in these cases as to unconstitutional delegation of legislative standards was not applied in Fahey et al. v. Mallonee et al., 332 U.S. 245, 67 S.Ct. 1552, 91 L.Ed. 2030 (1947), since the Supreme Court found that both cases were distinguishable on their facts. This case involved a provision of the Home Owners' Loan Act of 1953 that authorized a delegation of legislative discretion to the Federal Home Loan Bank Board to prescribe by regulation the terms and conditions under which a conservator may be appointed for a Federal savings and loan association.
 
 
 59
 The Supreme Court said in Fahey et al. v. Mallonee, supra, at p. 249, 67 S.Ct. at p. 1553:
 
 
 60
 * * * This, the District Court held, was unconstitutional delegation of the congressional function. It relied on Panama Refining Co. v. Ryan, 293 U.S. 388, [55 S.Ct. 241, 79 L.Ed. 446,] and Schechter [Poultry] [Corporation] [et al.] v. United States, 295 U.S. 495, [55 S.Ct. 837, 79 L.Ed. 1570].
 
 
 61
 Both cited cases dealt with delegation of a power to make federal crimes of acts that never had been such before and to devise novel rules of law in a field in which there had been no settled law or custom. The latter case also involved delegation to private groups as well as to public authorities. * * *
 
 And at p. 250, 67 S.Ct. at p. 1554:
 
 62
 The savings and loan associations with which § 5(d) deals, on the other hand, are created, insured and aided by the federal government. It may be that explicit standards in the Home Owners' Loan Act would have been a desirable assurance of responsible administration. But the provisions of the statute under attack are not penal provisions as in the case of Lanzetta v. [State of] New Jersey, 306 U.S. 451, [59 S.Ct. 618, 83 L.Ed. 888,] or United States v. L. Cohen Grocery Co., 255 U.S. 81, [41 S.Ct. 298, 65 L.Ed. 516.] The provisions are regulatory. They do not deal with unprecedented economic problems of varied industries. They deal with a single type of enterprise and with the problems of insecurity and mismanagement which are as old as banking enterprise. The remedies which are authorized are not new ones unknown to existing law to be invented by the Board in exercise of a lawless range of power. Banking is one of the longest regulated and most closely supervised of public callings. It is one in which accumulated experience of supervisors, acting for many states under various statutes, has established well-defined practices for the appointment of conservators, receivers and liquidators. Corporate management is a field, too, in which courts have experience and many precedents have crystallized into well-known and generally acceptable standards. A discretion to make regulations to guide supervisory action in such matters may be constitutionally permissible while it might not be allowable to authorize creation of new crimes in uncharted fields. [Emphasis supplied]
 
 
 63
 In the recent case of United States v. Robel, 389 U.S. 258, 88 S.Ct. 419, 19 L. Ed.2d 508 (1967), the Supreme Court found that a section of the Subversive Activities Control Act of 1950, which provided that when a communist action organization is under a final order to register, it is unlawful for any member of the organization "to engage in any employment in any defense facility," was unconstitutional.
 
 
 64
 Justice Brennan, concurring in the result, pointed out that the area of permissible indefiniteness in Congressional delegation of authority narrows when criminal sanctions are invoked and fundamental rights are potentially affected. However, by way of contrast, he added [Id. at 274-275, 88 S.Ct. at 429]:
 
 
 65
 Congress ordinarily may delegate power under broad standards. E. g., Dakota Central Tel. Co. v. [State of] South Dakota [ex rel. Payne,] 250 U.S. 163, 183, [39 S.Ct. 507, 63 L.Ed. 910;] FPC v. Hope Natural Gas Co., 320 U.S. 591, [64 S.Ct. 281, 88 L.Ed. 333;] NBC v. United States, 319 U.S. 190, [63 S.Ct. 997, 87 L.Ed. 1344.] No other general rule would be feasible or desirable. Delegation of power under general directives is an inevitable consequence of our complex society, with its myriad, ever changing, highly technical problems. "The Constitution has never been regarded as denying to the Congress the necessary resources of flexibility and practicality * * * to perform its function * * *." Panama Refining Co. v. Ryan, 293 U.S. 388, 421, [55 S.Ct. 241, 248, 79 L.Ed. 446;] Currin v. Wallace, 306 U.S. 1, 15, [59 S.Ct. 379, 83 L.Ed. 441.] It is generally enough that, in conferring power upon an appropriate authority, Congress indicate its general policy, and act in terms or within a context which limits the power conferred. See, e. g., State of Arizona v. State of California, 373 U.S. 546, 584-585, [83 S. Ct. 1468, 1489, 10 L.Ed.2d 542;] FCC v. RCA Communications, Inc., 346 U.S. 86, [38 S.Ct. 998, 97 L.Ed. 1470;] Lichter v. United States, 334 U.S. 742, [68 S.Ct. 1294, 92 L.Ed. 1694;] Yakus v. United States, supra, 321 U.S., [414 at 424, 64 S.Ct. 660, 88 L.Ed. 834;] Bandini Petroleum Co. v. Superior Court, 284 U.S. 8, [52 S.Ct. 103, 76 L. Ed. 136;] FTC v. Gratz, 253 U.S. 421 [, 40 S.Ct. 572, 64 L.Ed. 993]; Buttfield v. Stranahan, 192 U.S. 470 [, 24 S.Ct. 349, 48 L.Ed. 525.] * * *
 
 
 66
 We conclude that Congress gave sufficiently specific directives "within a context which limits the power conferred." Certainly, the Congressional Committee reports on the bill set out the basic guidelines and purposes for administrative action as to deferred officers who came within the quality control concept.
 
 
 67
 As a corollary to the assertion of uncontitutionality of the Act, plaintiffs further assert that the Secretary had no authority to delegate his own exercise of discretion to convene selection boards and specify the number of officers to be continued on the active list,[4] whereas the Deputy Chief of Staff Personnel allegedly performed these functions under delegation and orders from the Secretary. In this respect, the Act permits [74 Stat. 395]:
 
 
 68
 "(a) Not more than once in each fiscal year, the * * * Secretary of the Air Force may convene one or more boards * * * to review the records of, and recommend for continuation on the active list, officers of that component * * *.
 
 
 69
 "(b) A board convened under this section shall recommend officers for continuation on the active list in the number specified by the Secretary. * *" [Emphasis supplied]
 
 
 70
 We conclude that the delegation of authority to the Deputy Chief of Staff, Personnel, to convene the board and to specify the number of officers to be retained on active duty was a permissible and valid delegation.
 
 
 71
 The reason for this conclusion is obvious. Congress could not possibly have intended that every single power vested in the Secretary of the Air Force be actually executed by him. The multitudinous duties of that office would necessarily receive scant and superficial attention if the Secretary were to perform each function of his office personally. The fact that Congress also authorized an Air Staff (which includes the Deputy Chief of Staff of Personnel) to "furnish professional assistance to the Secretary"[5] supports this conclusion. This proposition is applicable where, as here, the decision to be made, viz., how many officers are to be continued on the active duty list, is in the nature of an expert opinion based on the accumulation and interpretation of many disparate facts peculiarly within the knowledge of the Deputy Chief of Staff in charge of Personnel. It is this expertise and knowledge upon which the Secretary relied when he authorized the Deputy Chief of Staff to make this decision. The "law does not `preclude practicable administrative procedure in obtaining the aid of assistants in the department.'" NLRB v. Duval, Jewelry Co., 357 U.S. 1, 7, 78 S.Ct. 1024, 1028, 2 L.Ed.2d 1097 (1958). In addition, it should be noted that the decision was not made by the Deputy in his own name, but rather in the name of the Secretary. The Secretary, in effect, "ratified" the Deputy's decision and issued the decision by his own authority. Cf. Wirtz v. Atlantic States Construction Co., 357 F.2d 442, 446 (5th Cir. 1966). We conclude that the sub-delegation of authority from the Secretary to the Deputy Chief of Staff, Personnel, was a valid delegation of power.
 
 
 72
 In further support of its assertion that the Act is unconstitutional because it fails to prescribe adequate standards for selecting officers retained or retired, plaintiffs assert:
 
 
 73
 * * * Under the statute, the Secretary, in carrying out its provisions, could retire mandatorily the youngest, the oldest, the tallest, the thinnest, or the heaviest officers, or all graduates of a particular educational institution, or those with blue eyes, who had at least twenty years of service and had been passed over more than twice for promotion to the next higher grade. This, we contend, clearly renders the statute unconstitutional and void. [Plaintiffs' Exceptions and Objections to the Commissioner's Report, p. 31]
 
 
 74
 The purpose of this Act, as clearly stated by the Cordiner Committee, the Senate Committee on Armed Services, and the House Committee was to emphasize measures to insure that only officers of the highest quality and potential were to be promoted or retained in these higher grades. To attain these objectives the Congress clearly envisioned the need for added flexibility in some of the statutory provisions controlling the promotion, retention and involuntary retirement of Regular officers, as shown by the legislative history of the Act.
 
 
 75
 As a further ground for assertion that the Act is unconstitutional, plaintiffs assert that they were not afforded the usual constitutional rights of a hearing confrontation and cross-examination.
 
 
 76
 The Act provides for alternative types of elimination or release from duty:
 
 
 77
 1. The show-cause action; and 2. Project 20-3 proceedings.
 
 
 78
 The first type of proceeding is used for elimination on the grounds of misconduct or gross inefficiency, while the second provides for retirement of officers as a personnel control measure. It is apparent, in reading the record of the Congressional hearings, that two types of proceedings were contemplated by Congress, and there is no question in reading the provisions of PL 86-616 that two separate and independent procedures and actions are provided for in the legislation. The statute contemplates that show-cause proceedings would involve hearings, counsel, confrontation and cross-examination — a full-fledged formal proceeding. On the other hand, Section 10 of the Act provides for a summary proceeding. Congress was fully aware of the distinction between the two procedures, as the legislative hearings and particularly the Committee reports demonstrate. In the case of Section 10 eliminations, Congress advisedly made provision for summary proceedings.
 
 
 79
 The stigma that could have resulted from specific charges of inefficiency or undesirability was one of the principal consequences of mandatory retirement by show-cause procedure which Congress intended to avoid by authorizing the alternative type of proceeding utilized in this case. Indeed, as the Deputy Chief of Personnel of the Air Force said, in reviewing this problem (supra):
 
 
 80
 Since the great majority of the eligible officers are all well qualified for promotion, the board soon realizes that in reality, they are selecting the best of the best qualified. [Emphasis supplied]
 
 
 81
 In this connection, the recent case of Chwat v. United States, 175 Ct.Cl. 392 (1966) is noteworthy. While this case involved the separation of a Foreign Service Officer, it would appear to have equal application to the instant case. The court stated, at p. 397:
 
 
 82
 When the plaintiff was "retired" or selected-out "because he did not measure up to the standards of his class" and also because the action was being taken under sections 633 and 634 of the Foreign Service Act, he was not entitled to a hearing, since none is provided under sections 633 and 634. * *
 
 
 83
 * * * * * *
 
 
 84
 [Citing report of the Committee on Foreign Affairs, Report No. 229, at page 12]:
 
 
 85
 * * * It should be observed that this section is not a substitute for the provisions governing separations for cause. * * * [Emphasis in original.]
 
 
 86
 It follows then, that the two methods for separating officers of the Foreign Service, by selection-out without a hearing under section 633, and by discharge after a hearing under section 637, stand on an equal footing and both methods have the approval of the Congress * * *. [Emphasis added]
 
 
 87
 In anticipation of the adoption of the Act, the Secretary, in April, 1960, convened a Screening Board of general officers of the Air Force to recommend a minimum-maximum quota of officers for continuation on the active list. After the Act became law, and pursuant to the recommendations of this preliminary Screening Board, the Chief of Staff, by order of the Secretary, on July 25, 1960, established by order a program for controlled retirement of the officers affected by the Act, known as Project 20-3. This order contained specific instructions to the first selection board therein appointed. The instructions provided, in part:
 
 
 88
 * * * Using the "Best Qualified" method of selection, the board shall select and recommend officers for continuation on the active list within the percentages prescribed below:
 
 
 89
 a. Permanent Colonel: Not less than 55% nor more than 75% of those considered.
 
 
 90
 b. Permanent Lieutenant Colonel: Not less than 45% nor more than 65% of those considered.
 
 
 91
 * * * Within the percentages specified above, a Deputy Chief of Staff, Personnel, shall establish for the Secretary of the Air Force during the course of the board, the exact number of officers in each grade to be selected for continuation * * *.
 
 
 92
 The Letter of Instructions further stated that "in making its selections, the board will be guided by the following pertinent considerations":
 
 
 93
 a. As a result of the rapid expansion of the Regular Air Force after World War II, officers were promoted to the permanent grade of Colonel with as little as 14 years of service, to permanent Lieutenant Colonel with as little as 8 years of service.
 
 
 94
 b. Until the exactment [sic] of Public Law 86-616, these officers could serve in the grade of Colonel for 16 years and in the grade of Lieutenant Colonel for 20 years prior to mandatory retirement for service.
 
 
 95
 c. Some of these officers have lost their initiative and drive; others have been unable to keep pace with technical and operational advances occurring subsequent to World War II.
 
 
 96
 d. Limitations placed upon the number of officers who may serve on active duty in the grades of Colonel and Lieutenant Colonel make it essential that only highly qualified officers continue to occupy these grades if the Air Force is to maintain a quality officer corps.
 
 
 97
 e. An officer once considered for continuation or involuntary retirement under Public Law 86-616 may not again be considered in that same grade.
 
 
 98
 These instructions were clearly in careful compliance with the purposes and directives of the Congress in enacting the statute.
 
 
 99
 Thereafter, the Selection (Continuation) Board reported that, upon careful consideration of all the records, it recommended 310 of 430 Colonels, an 589 of 964 Lieutenant Colonels for continuation, and that those not selected for continuation should be retired. Plaintiffs were listed among this latter category. The Board certified that it carefully reviewed the case of every officer submitted to it for consideration, and that a majority of the total board members concurred in the recommendations.
 
 
 100
 The trial commissioner has summarized the actions and conduct of the Board as follows:
 
 
 101
 (a) The Selection (Continuation) Boards of 1961 (Colonels Norman, Crowley, Buckland, Fitzgerald, and Buckey) and of 1963 (Colonel Martin) were composed of mature senior general officers of varying and extensive experience in many fields. They contributed judgment to the task of evaluation.
 
 
 102
 (b) In addition to the OER's (officers' effectiveness reports), they gave consideration in their evaluations to commendations, historical records of service, age, educational background, scope and level of responsibility of assigned position, and demonstrated qualities of leadership.
 
 
 103
 (c) * * * these boards did not rely upon IBM card selections of numerical equivalents of OER's. While they did devise and apply a numerical rating system of their own, they sometimes disregarded the results shown by it in that some officers were selected for continuation whose numerical values were less than those of some officers who were not selected for continuation.
 
 
 104
 (d) The significance of the concentration upon OER's in findings 14 through 26, relating to individual plaintiffs in this litigation, stems from the results of the statistical analysis of the White Charger Program to which reference was made in finding 13(a). In that study, the OER's of the officers, as individuals and as groups, were reduced to numerical equivalents from which averages were derived. In each of the individual cases herein considered, the affected officer fell into a position below the mean or average into a relative position vis-a-vis his fellow officers who were also under consideration to such an extent as to absolve the decision of the continuation board of serious question.
 
 
 105
 * * * * * *
 
 
 106
 (b) The Secretary of the Air Force has administered Project 20-3 in conformity with the authority granted to him by the Congress. There is no evidence of arbitrary, capricious, or illegal action by the Secretary in such administration; nor is any action by the Secretary or of the screening and selection boards convened by him lacking in support by substantial evidence. [Commissioner's Report, pp. 29 and 30]
 
 
 107
 We concur in these findings as amply supported by the record. The Board's failure to select plaintiffs for continuation was not arbitrary, or unsupported by substantial evidence.
 
 
 108
 In Goldstein v. United States, 130 F. Supp. 330, at p. 332, 131 Ct.Cl. 228, at p. 232, cert. denied 350 U.S. 888, 76 S. Ct. 143, 100 L.Ed. 782 (1955), this court stated:
 
 
 109
 * * * Nor can this court undertake to grant plaintiff promotions or assignments which the Army having jurisdiction over him decided not to make. * * *
 
 
 110
 In Donnelly v. United States, 134 F. Supp. 635, at p. 636, 133 Ct.Cl. 120, at p. 122 (1955), this court stated:
 
 
 111
 * * * Perhaps it was wrong for the Navy not to have promoted plaintiff; * * *. Appointment is an executive function, involving the exercise of executive discretion. * * * This court cannot exercise this function and in the absence of actual appointment, or facts equivalent thereto, we cannot award Plaintiff Donnelly compensation as commissaryman, chief. * * *
 
 
 112
 See, Chase v. United States, 159 Ct.Cl. 610 (1962).
 
 
 113
 In the case of Johnson v. United States, 280 F.2d 856, at p. 858, 150 Ct. Cl. 747, at p. 751 (1960), cert. denied, 365 U.S. 882, 81 S.Ct. 1034, 6 L.Ed.2d 194 (1961), this court stated:
 
 
 114
 We think that the proper exercise of judicial restraint requires this court to decline to intervene in this matter. Certainly it was no part of the original act by which Congress created the jurisdiction of this court to make us the overseer of the military. * * *
 
 
 115
 We conclude that Section 10 of the Act of 1960, supra, is a constitutional delegation of discretionary power to the Secretary of the Air Force within the limitations and purposes of the Act; that his delegation of review to the Selection or Continuation Board was within constitutional limitations, and that the recommendations of the Board and the action of the Secretary thereupon were not arbitrary, capricious, or contrary to law, and are supported by substantial evidence.
 
 
 116
 For the above reasons, plaintiffs are not entitled to recover, and their petitions are dismissed.
 
 
 
 Notes:
 
 
 [1]
 Section 10 of Public Law 86-616, approved July 12, 1960, 74 Stat. 386, 395
 
 
 [2]
 Approved August 7, 1947, 61 Stat. 795
 
 
 [3]
 Bell v. United States, 366 U.S. 393, 401, 81 S.Ct. 1230, 6 L.Ed.2d 365 (1961); Cf. Leonard v. United States, 279 U.S. 40, 49 S.Ct. 232, 73 L.Ed. 604 (1929); United States v. McDonald, 128 U.S. 471, 9 S.Ct. 117, 32 L.Ed. 506 (1888); Byrd v. United States, 103 Ct.Cl. 285 (1945); Anchanitzky v. United States, 81 Ct.Cl. 409, cert. denied, 296 U.S. 598, 56 S.Ct. 114, 80 L.Ed. 423 (1935); Fulmer v. United States, 32 Ct.Cl. 112 (1897); Magaw v. United States, 16 Ct. Cl. 3 (1880); Lowry v. McCarl, 65 App. D.C. 19, 79 F.2d 144 (1935); Heidt v. United States, 56 F.2d 559 (5th Cir. 1932)
 
 
 [4]
 This is the only challenge to the Secretary's power to sub-delegate his authority raised by plaintiffs in their brief. See, Plaintiffs' Brief, pp. 38-40
 
 
 [5]
 Act of Aug. 10, 1956, c. 1041, 70A Stat. 490; Aug. 6, 1958, Pub.L. 85-599, § 4(h), 72 Stat. 517, 10 U.S.C. § 8032