Davis, Judge,
dissenting:
After a full hearing, Trial Judge Bernhardt found that there was present before the 1966 and 1967 selection boards “material which should not have been before them,” preventing the record considered by those boards from being “free from bias and distortion.”[1] The trial judge’s detailed findings (now partially modified by the court) support this conclusion. ¡I accept these determinations. “Under our rule, the commissioner’s [trial judge’s] findings of fact are presumed *699 to be correct because of his opportunity to hear the witnesses and to determine the weight to be accorded to their testimony. A party who undertakes to overcome this presumption must make a strong affirmative showing to the contrary.” Hebah v. United States, 197 Ct. Cl. 729, 732, 456 F. 2d 696, 698, cert. denied, 409 U.S. 870 (1972). In this case, though there may be room for some doubt I am not at all convinced that the preponderance of the evidence goes against the trier’s determination, nor do I believe that the Government has made a strong affirmative showing that he was wrong. To me, it does not seem unlikely that the boards knew more than they should about the proceedings and consequences of the board of investigation, including the withdrawn letter of censure and the substituted letter of instruction.
The question then becomes whether it was material error for the boards to have had and considered this information. I wholly agree with the majority that a selection board is forbidden to consider anything not authorized by the governing statute and regulations, and I am of the further view that a board’s actions on the basis of an improper “record” are invalid. See Weiss v. United States, 187 Ct. Cl. 1, 15, 408 F. 2d 416, 423 (1969) (concurring opinion). The whole structure of the selection-board system — as established by the statute and regulations — contemplates that the officer will know what derogatory information is to be weighed and will have a chance to respond to it. The regulations carefully delimit what the officer’s record shall consist of, and they make a special point of declaring that “ [a] dverse matter shall not be placed in an officer’s record without his knowledge” and that “[n]o anonymous communications are made a part of the officer’s record.” Communications which are not part of the regular personnel file are excluded from the material given to the board, unless perhaps they contain nothing derogatory.
Under this regime, the board members are to decide on the basis of the information in the folders put before them. They are not to be influenced by personal preferences, unsubstantiated hearsay, gossip, rumor, or even general reputation which is not reflected in or supported by the fitness reports *700 and other papers before them.[2] According to the regulations, the officer’s official record maintained in the Bureau of Naval Personnel is supposed to incorporate and reflect “the official history of his career in the Navy.”
If one accepts, as I do, the trial judge’s findings, there is no doubt that Brenner’s selection boards had access to and took account of material not properly a part of this official history. Neither the proceedings nor the report of the Board of Investigation were includable in the proper selection 'board record because the inquiry proceeding — which there is good reason to believe was procedurally defective — was still incomplete and unreviewed. Admiral Buckner himself wrote to plaintiff (early in 1967) that substantial new evidentiary matters presented in plaintiff’s appeal mitigated the dereliction alleged and would have possibly averted action of a punitive nature if such matters had been available to the Board of Investigation. As for the letters of censure and instruction, they too should not have been seen. The first was wholly withdrawn and the other was barred by Navy directive from inclusion in the record. The JAG Manual, § 0101(c), Change 16, March 29, 1966, provided that non-punitive letters of censure are not to be included in the officer’s personnel file, and this of course would likewise apply to letters of instruction, a milder form of sanction. Plaintiff did not know that any of these materials was to be taken into account, and he had no opportunity to explain the situation from his own standpoint.
The applicable rule was well stated by the court, by way of considered dictum, in Weiss v. United States, supra, 187 Ct. Cl. at 7, 408 F. 2d at 419: “But the selection procedure must follow the law. The documents which are sent to a Selection Board for its consideration therefore must be substantially complete, and must fairly portray the officer’s record. If a Service Secretary place before the Board an alleged officer’s record filled with prejudicial information and omits *701 documents equally pertinent which might have mitigated the adverse impact of the prejudicial information, then the record is not complete, and it is before the Selection Board in a way other than as the statute prescribes.”
In my view, that is precisely what happened here (as it did in Weiss). It follows that plaintiff was illegally passed over, twice, by the invalid decisions of the selection boards, and as a direct consequence was illegally separated. The statute does not authorize separation unless the officer is lawfully passed over. Plaintiff is therefore entitled to recover, but I agree with the trial judge and the court that he could not obtain more than the pay of the grade at which he was discharged. We cannot say that, if the selection board proceedings had been entirely proper, he would necessarily or even probably have been promoted. But we can and should say that he should not have been discharged as the result of invalid selection board determinations.
Laramore, Senior Judge, and Ktjnzig, Judge, join in the foregoing dissenting opinion.
UNKINGS OF FACT
1. Plaintiff, born August 25, 1935, served in the United States Marine Corps Reserve from August 29, 1952, graduated from high school in 1954, and from active duty in the Marine Reserves won a competitive appointment to the United States Naval Academy, Annapolis, Maryland, standing within the top 160 authorized competitive appointments for enlisted members of the United States Navy and Marine Corps Reserves. He graduated from the Academy on June 4, 1958, with a Bachelor of Science degree, and was commissioned as an ensign. He was promoted to lieutenant (j.g.) on December 4,1959, and to lieutenant on March 25,1967 (effective retroactively to June 1, 1962). He was honorably discharged effective June 7,1968.
2. During his naval career he was assigned sea duty on several destroyers and guided missile frigates, serving successively as antisubmarine warfare officer, gunnery officer, missile officer, assistant weapons officer, and weapons officer. He also had shore assignments as Training Program Manager *702 for the Navy’s Terrier Guided Missile Program, Dam Neck, Virginia, for 2 years, was stationed at the Bureau of Naval Personnel (BuPers) in Washington, D.C., on the Navy’s Surface-to-Air Guided Missiles Systems, and in December 1966 he commencedwhat eventually proved to be a terminal assignment with the Navy Sub-Board of Inspection and Survey at Newport, Rhode Island.
3. During his naval service plaintiff received various commendations, honors, and praise:
(a) On July 1, 1965, while serving on the U.S.S. Luce plaintiff was qualified as CIC watch officer and command duty officer by Comdr. Lademan, commanding officer of the U.S.8. Luce. In making these certifications to plaintiff Comdr. Lademan recognized plaintiff’s “demonstrated ability and sound judgment”, stating as to the former that he had “complete confidence * * * in your ability to handle the ship under all conditions.”, and as to the latter that “This watch qualification [actually referring to the qualification as command duty officer] is the highest attainable aboard Luce and represents the complete confidence of the commanding Officer in your ability to represent him as necessary in all matters administrative and operational * * This was the same Comdr. Lademan who, as plaintiff’s rating officer, made out plaintiff’s fitness report for the period from July 1,1965 to February 19,1966, and whose comments therein as to plaintiff’s character were incompatible with his remarks of July 1, 1965, quoted above. (See finding 23 (k), infra.)
(b) On December 2,1966, Admiral Ruckner, the commanding officer of the Cruiser-Destroyer Force, U.S. Atlantic Fleet, commended the commanding officer of the Luce and his crew for the excellent rating given the ship during maneuvers on November 22 and 23, 1966, noting vast improvement in performance of its nuclear weapons mission. At that time the plaintiff was weapons officer of the Luce and his performance as such was largely responsible for the commendation. (Admiral Ruckner on May 11,1966 had issued a letter of censure to plaintiff, and withdrew it on January 28, 1967 (finding 19(c),infra).
(c) On September 18, 1967, Comdr. J. C. Drake, then *703 commanding officer of the Luce, issued plaintiff a Letter of Commendation which read in part as follows: “In Weapons Department evolutions, your demonstrated ability throughout the competitive year was noteworthy. * * * In your capacity as Weapons Officer, you made a personal and direct contribution toward the winning of this award [i.e., Departmental £E’ for Excellence awarded by Admiral Buckner to the Luce, the only missile type destroyer so honored].” On that occasion the plaintiff was commended for “outstanding performance of duty. * * * Well done! * * * A copy of this letter will be made a permanent part of your service record.” Another undated commendation by Comdr. Drake to plaintiff was for his “individual performance and achievements” as weapons officer during the period July 1, 1966 to November 28,1966, on the Luce which “contributed measurably” during the fiscal year ending June 30,1967, to the Luce winning several outstanding performance awards.
(d) On October 2, 1967, Admiral Eli T. Beich wrote to plaintiff’s 1967 Selection Board recommending favorable consideration of plaintiff’s promotion to lieutenant-commander referring to plaintiff as an “outstanding young officer whom I felt had great potential,” and to his contribution as weapons officer to the winning by the Luce of a Weapons “E”. This letter, which refers to a missile mishap during plaintiff’s tenure as weapons officer of the Luce, which resulted in an investigation, was available for examination by plaintiff’s 1967 Selection Board (see finding 31, infra).
(e) On April 12, 1962, Admiral Sends congratulated the commanding officer, officers and crew of the U.S.S. Dewey for their “splendid performance” in solving the problems plaguing the Terrier weapons system. “A sincere well done.” Plaintiff at the time was missiles officer for the Dewey and an authority on the Terrier missiles, and therefore was instrumental in the earning of the commendation.
(f) On June 12,1963, Office of the Chief of Naval Operations complimented plaintiff for his authorship of an article entitled “The Terrier BT-S” for publication in combat READINESS.
(g) On July 27,1960, the commanding officer of the U.S.S. *704 Blandy (DD-943) on which the plaintiff was tbe antisubmarine warfare officer, issued a commendation to plaintiff for his “outstanding performance of duty” in that capacity from May 1959 until March 1960. The Blandy had won the Antisubmarine Warfare Departmental Excellence Award for fiscal year 1960 for demonstrating “that she was one of the most effective ships of her class [destroyer] in deslant in over-all asw readiness.”
(h) On August 16, 1960, the plaintiff was issued a commendation by the commanding officer of the Blandy for his “substantial contribution” to the award of a Battle Efficiency Plaque to the Blandy for fiscal year 1960.
(i) The commendations and complimentary references described in paragraphs (b), (c), (e), (f), (g) and (h) of this finding were permanently placed in plaintiff’s file of fitness reports and were available to future Selection Boards.
4. Plaintiff was assigned as weapons officer to the O.S.S. Luoe, a guided missile destroyer then under the command of Comdr. Lademan, reporting there May 23, 1965. On January 19,1966, while the Luoe was anchored at Mayport Naval Air Station, Florida, a nuclear-armed surface-to-air guided missile known as the Terrier was dropped on the deck of the Luce from a height of several feet while being routinely handled. The Terrier is 27 feet in length and iy2 tons in weight. The missile did not explode. Demolition crews removed it. There were no injuries. There was considerable publicity over the accident because of its potential consequences, although the Navy officially reported that because of the construction of the Terrier there was no risk of an explosion. As weapons officer the plaintiff had technical responsibility for the incident, whether or not he was negligent, according to the military rule of command responsibility.
5. Several official investigations were conducted of the missile accident circumstances referred to in finding 4, supra. One was by Comdr. Lademan, commanding officer of the Luoe, assisted by Lt. Comdr. Kosmela, his executive officer. Another was by the Bureau of Weapons. Another by the Bureau of Ships. The principal investigation was by an Informal Board of Investigation.
6. At the instance of Admiral Buckner (finding 3(b), *705 supra), an Informal Board of Investigation convened January 22, 1966, and adjourned February 17, 1966. Tbe Board consisted of three members (Capt. Schremp as senior member, assisted by Capt. Upshaw and a third member). The Board had subpoena power and authority to swear witnesses. A number of officers and enlisted personnel aboard the Luce testified in camera. The plaintiff was not present or represented at their testimony. Comdr. Lademan was present throughout the Board sessions. Plaintiff appeared voluntarily before the Board on Saturday, January 29, 1966, and testified at great length until fatigued when the Board recessed at 11 p.m.
7. On the next day, Sunday, January 30, 1966, without being fully cognizant of the nature and scope of the Board investigation, and without representation by counsel, plaintiff requested that he be made a Party to the investigation. No action could be taken on the request due to the absence of a third member of the Board. Plaintiff then conferred by telephone with his father, who was a lawyer and a retired (1958) Marine legal officer, who told him that he had perhaps been premature in requesting to be made a Party, and suggested that plaintiff merely continue to cooperate with the Board proceeding.
8. On Monday, January 31, 1966, plaintiff withdrew his request to be made a Party, and advised the Board that he wanted to continue to cooperate informally with the investigation without becoming a Party. Capt. Schremp advised him that he could not act on the withdrawal request in the absence of the third member of the Board. The next meeting of the Board was scheduled for February 7,1966. Plaintiff left on January 31 for a 5-day cruise on the Luce. While at sea he was sent a dispatch advising him that he had been made a Party to the investigation “at his request.” [1]
*706 9. The principal rights of a Party in Interest to an investigation are:
(a) to be given due notice of designation as such.
(b) to be present during proceedings, except deliberations.
(c) to be represented by counsel.
(d) to cross-examine witnesses.
(e) to introduce evidence.
(f) to testify as a witness.
(g) to refuse to incriminate oneself.
(h) to make an argument at close of evidence.
10. Upon plaintiff’s being made a Party to the investigation. Lt. Eoy Olson was assigned as his military counsel. Plaintiff’s father, Lt. Colonel Ernest Brenner, USMB, was permitted to act as plaintiff’s individual counsel to assist Lt. Olson. Capt. Schremp advised plaintiff that the Board was investigating the incident simply to find facts, and that probably no more than a letter of censure would result.
11. At the resumption of the Board proceeding on February 9, 1966, the plaintiff was called as a witness. On advice of counsel plaintiff declined to testify. Plaintiff did not testify, but he and his counsel attended the remaining Board sessions until it adjourned February 17, 1966. On that date the plaintiff’s security clearance was terminated.
12. Comdr. Lademan was also a Party to the investigation and attended all of the Board sessions represented by counsel. He was selected for a “due course” promotion to captain by the Selection Board that met in the late summer of 1966, having not been passed-over by any prior Selection Board. His executive officer, Lt. Comdr. Kosmela, was also promoted to commander in 1966.
13. The Board of Investigation record is classified as “Secret” and is not in evidence. It is not a verbatim transcript of the testimony, but paraphrases it. Plaintiff and some others in his behalf have seen the record, but present counsel requested its production informally and has not been given the opportunity to see it.
14. Some time prior to May 11, 1966, the Board recommended that plaintiff be issued a punitive letter of admoni *707 tion relative to eight alleged specified derelictions in the performance of his duty.
15. On May 11, 1966, Admiral Buckner, the convening authority for the Board of Investigation, sent plaintiff a letter of censure in the degree of admonition. The letter referred to the missile mishap investigation and listed four personal derelictions on plaintiff’s part as weapons officer (reduced from eight derelictions recommended by the Board) ,[2] none of which expressly referred to the missile accident which had precipitated the Board proceeding. The letter admonished plaintiff “For such negligence in the performance of your duties”, advised him of his right to appeal the action within a reasonable time (set at 15 days after receipt of the letter in the absence of unusual circumstances), and advised that a copy of the letter would be placed in his official record in BuPers unless withdrawn or set aside by higher authority. Plaintiff was also advised of his right, within 15 days after final determination of any appeal, to submit for inclusion in his record at BuPers such statement concerning the letter of censure as he might desire. The letter concluded : “Your reporting senior is required to make notation of this letter in your fitness report submitted next after the issuance of this letter has become final, either by decision of higher authority upon appeal or by your decision not to appeal.” The letter of censure was not in fact included in any of plaintiff’s fitness reports since it was withdrawn. Nor was the letter of instruction which replaced it. See finding 23(1), infra.
16. Plaintiff received the letter of censure on May 28,1966. On May 31,1966, he wrote to Admiral Buckner requesting a 4-month extension to prepare and file his appeal, citing the fact that on June 13, 1966, the Luce (with him as weapons officer aboard) would be deployed to the Mediterranean for 4 months. He also mentioned that advice of counsel would be necessary in preparing an appeal, and requested that he and his counsel have the Board record of proceedings made *708 available to them for inspection in connection with, preparing the appeal.
17. There followed a series of communications relative to plaintiff’s effort to obtain a time extension to file his appeal, viz:
(a) On June 8, 1966, Admiral Buckner wrote to plaintiff giving him an extension to July 20,1966 (letter not received by plaintiff aboard Luce until July 27, 1966), and giving limited permission to plaintiff’s military counsel to inspect the Board record.
(b) On July 7,1966, plaintiff’s father, as counsel for plaintiff, wrote to Admiral Buckner enclosing a tentative appeal from the letter of censure citing deficiencies in the Board proceeding, requesting an extension of time for preparing an adequate appeal to 80 days after plaintiff’s return to the United States, and requesting that there be made available for examination the complete Board record necessary in the preparation of an appeal.
(c) Having had no reply to his letter of May 31,1966, requesting atime extension (Admiral Buckner’s reply of June 8, 1966, was not received by plaintiff until July 27), and having learned by telephone on June 8,1966, that Admiral Buckner was considering an extension to July 20,1966, for the plaintiff to file an appeal, the plaintiff on July 14,1966, wrote to Admiral Buckner advising him that the commander of the Luce had made available to him a copy of the Board record, and requested an extension to 30 days subsequent to the Luce’s return to the United States. Plaintiff advised Admiral Buckner that preparation of his appeal was complicated by his extremely heavy operational commitments on the Luce during its cruise, by his inability to consult with counsel, and by his counsel’s inability to obtain permission to examine the Board record.
(d) Plaintiff’s letter of July 14,1966, to Admiral Buckner described in paragraph (c) of this finding was accompanied by a first endorsement dated July 20 by the commanding officer (Drake) of the Luce urging that plaintiff be given the time extension to appeal that he had requested, that plaintiff *709 be relieved of his duties temporarily from the Luce and be transferred on temporary duty at Admiral Buckner’s headquarters so that he could devote requisite time to the preparation of his appeal, and stating as follows:
This is a very critical matter to this young naval officer. In effect he feels, and perhaps with good reason, that his entire future hinges on his ability to appeal successfully from this letter. He will be in the promotion zone for Lieutenant Commander this year. He cannot help but be affected in his daily activities by thoughts about the letter and fear of its consequences. His performance of duty in this ship is affected adversely therefore, and the effect of the letter is being compounded to the detriment of all.[3]
(e) Having received plaintiff’s letters of May 31 and July 14,1966, and the letter of July 8,1966, from plaintiff’s father, all of them relative to plaintiff’s request for a time extension to appeal the letter of censure, on July 27, 1966, Admiral Buckner advised the commander of the Luce by teletype that “no new basis for 4 months time extension exists”, and that plaintiff could not be temporarily detached from the Luce to give him time to prepare his appeal (as the commander of the Luce had suggested), but that the request and Admiral Buckner’s ruling thereon would be forwarded to the C-in-C, U.S. Atlantic Fleet for “resolution and disposition.” Thus as of July 27,1966, with all the facts known as to plaintiff’s absence on an extended cruise and his inability to prepare an adequate appeal to the letter of censure, Admiral Buckner was not disposed to give him an extension.
(f) By first endorsement of August 5, 1966, Admiral Buckner forwarded to the C-in-C, U.S. Atlantic Fleet, all of the papers relevant to the letter of censure and plaintiff’s efforts to secure an extension of time to file an appeal (except *710 the Board record which had previously been sent on May 14, 1966, to JAG via the C-in-C), and recommended to the C-in-C “that no further extension of appeal be granted, and that the appeal he denied.” (Emphasis supplied.) A copy of this endorsement was sent to plaintiff, and another copy was sent to plaintiff’s father on August 16, 1966, which was the first response the latter had received to his letter of July 7,1966, as stated in paragraph (b) of this finding. Apparently Admiral Buckner felt either that the correspondence he had received to date from plaintiff or in his behalf constituted a sufficient appeal, or that plaintiff’s appeal time had lapsed and the right had been forfeited. (This is merely an interpretation of the Admiral’s first endorsement of August 5, 1966, referred to above.)
(g) On September 30, 1966, the Deputy Chief of Staff, U.S. Atlantic Fleet, wrote plaintiff’s father advising him that plaintiff was granted an extension of time to November 25, 1966, to submit his appeal from the letter of censure. The plaintiff received formal notification of the extension on November 22,1966, abroad the Luce at sea [4] when he received a letter dated November 9, 1966, to that effect from the Assistant Chief of Staff of the TT.S. Atlantic Fleet based in Norfolk, Virginia. Why formal notification to plaintiff was delayed until November 9, 1966, when plaintiff’s father was given formal notification by the U.S. Atlantic Fleet on September 30, 1966, is not apparent. Nor does the record reveal whether plaintiff’s father was able to communicate the news of the time extension to plaintiff within a reasonable time after September 30,1966.
(h) On November 24,1966, plaintiff submitted his appeal, one day prior to the November 25,1966, deadline. In his appeal plaintiff set out ten assignments of error, viz:
(1) Failure to designate plaintiff as a Party at the initiation of proceedings.
*711 (2) Failure to afford him the rights of a Party.
(8)Refusal to permit him to withdraw his request to be made a Party.
(4) Failing to inform him of the reasons for concluding that he should be designated a Party.
(5) Making findings adverse to him.
(6) Failing to afford him a fair and impartial hearing.
(7) Subjecting his appointed counsel to improper influence.
(8) Adversely commenting upon his exercise of his right not to testify.
(9) Conducting proceedings at such time that he was unable to protect his interest.
(10) Unduly and improperly harassing the efforts of his individual counsel.
(i) Routine mail delivery from the United States to personnel on the Luce while it was on extended maneuvers in the Mediterranean took from 3 to 5 days.
18. On January 28, 1967, Admiral Ruckner wrote to the C-in-C, U.S. Atlantic Fleet that, based on plaintiff’s appeal, he had set aside the punitive letter of censure, and requested that the copy of the letter of censure forwarded to the C-in-C previously “be destroyed or returned to the originator.”, namely, himself. On February 9, 1967, the C-in-C, U.S. Atlantic Fleet, advised Admiral Ruckner by letter that the letter of censure had been destroyed as requested.
19. (a) Also on January 28,1967, Admiral Ruckner wrote to the JAG, with copy to plaintiff, advising that plaintiff’s appeal “presents substantial new evidentiary matters that are in conflict with the evidence before the board” and which, had they been available earlier, “ the punitive letter may not have been issued.” The new matters, said Admiral Ruckner, “do mitigate the derelictions alleged”, and therefore he “has set aside the letter of admonition and issued a letter of instruction to Lt. Brenner.” Finally: “Additionally, [I] consider that the investigation, as in the case of Commander Dixon M. Lademan * * * should be made a matter of interest *712 in tbe official record of Lt. George H. Brenner.”[5] No copy of this letter to JAG was sent to C-in-C, U.S. Atlantic Fleet.
(b) The Board record is classified as “Secret” and a copy is in the custody of JAG along with all sequential endorsements, including references to Admiral Buckner’s letter of censure to plaintiff, his withdrawal thereof and substitution of a letter of instruction, and his suggestion to JAG to deposit the entire package in plaintiff’s official record as a “matter of interest.” It is not disclosed when the records were transmitted by JAG to BuPers, but it is concluded that they were so transferred sometime after January 28,1967, because on January 31, 1968, one year later, the Ohief of Naval Personnel caused an endorsement to be attached thereto, which recited the instructions of January 28,1967, received by JAG from Admiral Buckner and stated as follows:
* * * However, lacking a supplementary investigation to reconcile the evidentiary matters in conflict, it is not considered appropriate to hold this investigation as a matter of interest in the official records of either cdr LADEMAN, the CO of LU0E, OT LT. BRENNER. * * *
(c) Also on January 28, 1967, Admiral Buckner wrote to plaintiff stating that the proceedings of the Board were in substantial compliance with the JAG Manual requirements for an informal investigation, but that the substantial new evidentiary matters presented in plaintiff ’s appeal mitigated the dereliction alleged and would have possibly averted action of a punitive nature if such matters had been available to the Board. Therefore Admiral Buckner advised plaintiff that he had set aside the letter of censure previously issued plaintiff, and stated as follows:
*713 Nevertheless, it is apparent that there were deficiencies in the Weapons Department on board uss luce (dlg7) and that as Weapons Officer you were responsible for the proper administration of this department. Although the circumstances as now presented do not warrant punitive action, it is considered that your performance prior to the incident involved was deficient. You are, therefore, to take the contents of reference (b) [the letter of censure] as a caution, not in the sense of Article 15, troMu, but merely instructional in nature. Reference (b) [the letter of censure] will not be made a part of your official record and will not be forwarded to higher authority.[6] Its sole purpose is the improvement of your performance of duty.
At this time the plaintiff was no longer under Admiral Buckner’s command. Note in finding 3(b), supra, that on December 2, 1966, Admiral Ruckner had indirectly commended plaintiff.
(d) An official communication from Navy JAG dated August 11,1971, and placed in evidence as a defendant’s exhibit states as follows:
The letter of admonition [i.e., letter of censure in the degree of admonition] which would have been awarded as non-judicial punishment (10U.S.C. 815) was, as Commander Cruiser-Destroyer Force U.S. Atlantic Fleet stated in his endorsement, withdrawn by him and no record that it had ever been awarded remains in any record. The letter of instruction issued in its place would of necessity be non-nonpunitive [sic] and therefore would not appear as such in Lieutenant Brenner’s record. The original was undoubtedly delivered to Lieutenant Brenner with no other distribution of copies.
20. On February 20, 1967, plaintiff’s individual counsel (his father) wrote to the JAG complaining that Admiral Ruckner had, in violation of JAG Manual provisions, directed JAG to include the Board record in plaintiff’s official record as a matter of interest, after having asked the C-in-C U.S. Atlantic Fleet to destroy the letter of censure (which was *714 done). The letter requested that the Board record reflect that the letter of censure was set aside, that the Board record not refer to the issuance of a nonpunitive “letter of instruction”, and that the Board record not be made a matter of interest in plaintiff’s official record as Admiral Buckner had ordered. There is no indication as to whether this letter was ever answered or complied with, except to the extent reflected in finding 19(d), sufra-.
21. In May 1966 complete copies of the Board of Investigation record (including first endorsement) were sent by Admiral Buckner to jag, BuWeapons, Ship Missile Systems Engineering Station, Naval Weapons Evaluation Facility, and the commanding officer of the Luce. Also in May 1966 Admiral Buckner sent a copy of the first endorsement to the Board of Investigation record, only, to the Commander of Cruiser-Destroyer Flotilla six, Commander Destroyer Squadron eight ; and to the senior member of the Board of Investigation (Capt. Schremp). The first endorsement indicated that a letter of censure had been issued to plaintiff. As stated in finding 19 (b), sufra, the Board of Investigation record, etc., were lodged with BuPers from sometime after January 28,1967, until at least January 31,1968.
22. (a) Throughout the 10 years of his active duty in the Navy the plaintiff received 22 periodic fitness reports. Four important sections of each fitness report are:
14. Performance of duties
15. Overall evaluation
16. Desirability
20. Leadership
Each of these listed categories on the fitness reports (except No. 15) is subclassified into either duty assignments or personal characteristics. Each of the subcategories is columnized for the officer to be rated from “Outstanding” or its equivalent (at the top of the range) down to “adverse” (at the bottom of the range). The officer is rated by his superior officer during the particular rating period. In rating the officer, the superior will indicate by inserting X-marks in the appropriate boxes as to those subcategories for which no rating is given because the officer being rated has not been observed with respect to *715 those subcategories. As to all other subcategories where the officer being rated was observed, the rating officer inserts an X-mark in the appropriate box to indicate as objectively as possible his judgment of the subject officer’s earned rating for the period covered by the report.
23. In order to determine statistically from plaintiff’s 22 fitness reports how he averaged out in comparison to a median, your trial commissioner devised a system of giving weighted points to each box, from 5 at the top end (outstanding) to 1 at the bottom end (adverse), and comparing the plaintiff’s points to the artificial median. The following results were obtained from this analysis:[7]
(a) 14 — Performance of duties — Out of 22 reports the plaintiff equalled the median in 3 reports and exceeded the median in 19 reports.
(b) # 15 — Overall—Out of 22 reports the plaintiff equalled the median in 8 reports and exceeded the median in 14 reports. Defendant’s requested finding 12(d) analyzes plaintiff’s scores in this category to reflect that in several fitness reports the plaintiff was placed at the bottom of the rating officer’s list of preferences where the latter was simultaneously rating several officers. (See paragraph (g) of this finding, infra.)
(c) # 16 — Desirability—Out of 22 reports the plaintiff equalled the median in 5 reports, was less than the median in 3 reports, and exceeded the median in 14 reports.
(d) 20 — Leadership—in 22 reports the plaintiff equalled the median in 3 reports and exceeded the median in 19 reports.
(e) In 13 out of 22 fitness reports the plaintiff exceeded the collective median covering all 4 categories selected for analysis.
(f) In 19 out of 22 fitness reports the plaintiff equalled or *716 exceeded the collective median covering all 4 categories selected for analysis.
(g) Plaintiff’s ratings throughout the 22 reports were generally better in categories 14 and 20 (Performance of Duties, and Leadership, respectively), than in 15 and 16 (Overall, and Desirability, respectively). The categories of “Overall” and “Desirability” necessarily represent an entirely subjective and inherently imprecise value judgment by the rating officer, at least in comparison to the more objective type of grading criteria present in the “Performance of Duties” and “Leadership” categories. Thus a prickly personality could make an officer an undesirable shipmate, even though he might excel in many nautical proficiencies highly relevant to his ultimate military role.
(h) The plaintiff’s most consistently successful years of achievement as reflected in the four selected categories of his fitness reports were from June 1, 1959 to June 30, 1965. In his last 3 reports covering the period from November 29, 1966, to his discharge in June 1968, he was embittered and not highly motivated as a result of being passed-over by the Selection Boards and the prospective end of his naval career through what he considered unfair circumstances.
(i) The plaintiff seemed capable of high achievement on many occasions, as witnessed in the honors and commendations which he won directly or indirectly (see finding 3, supra). While the plaintiff’s ratings for the various categories would vary from period to period, or from rating officer to rating officer, the impression is gained from a close study of all of his fitness reports that the plaintiff excelled in such matters as ship handling, seamanship, gunnery, military bearing, loyalty, and self-expression, while he was sometimes average or less in matters of judgment, reliability, cooperation, and compassion with subordinates.
(j) Each fitness report contained a “Comments” section in which the rating officer discussed strengths, special accomplishments, contributions to the service, and minor weaknesses. The person that collectively emerges from these comments (with sometimes contradictory and fluctuating characteristics depending on the reaction of the individual *717 rating officer to the individual being rated, as well as the fluctuating caliber of plaintiff’s performance and motivation from one reporting period to another) is that on the plus side the plaintiff impressed many of his rating officers as energetic, highly motivated, 'ambitious, dedicated, alert, intelligent, enthusiastic, resourceful, and highly qualified in ship handling, seamanship, and gunnery. On the minus side the plaintiff impressed some of his rating officers as being undiplomatic, dictatorial to subordinates, bored with routine duties, lacking judgment, impulsive rather than thoughtful. Gen-eiafly speaking the adverse comments respecting the plaintiff were as to facets of his character which should improve with time and maturity, and the favorable comments revealed an officer with considerable potential for achievement.
(k) Of all the comments contained in plaintiff’s fitness reports, the least flattering were those on plaintiff’s fitness report for the period July 1, 1965-February 19, 1966, by Comdr. Lademan. This is the period during which the missile incident of January 19, 1966, and the Board inquiry of January 22-February 17, 1966, occurred, in which both plaintiff and Comdr. Lademan were named as Parties.[8] This particular fitness report was furnished plaintiff on May 19,1966, by BuPers, and his comments were invited. Plaintiff, who was then at sea on a protracted cruise aboard the Luce, responded on September 11, 1966, with a lengthy rebuttal of Comdr. Lademan’s derogatory comments. The plaintiff was then aware that he was scheduled for promotion by the Selection Board and he was discouraged over the potential effect of the fitness report in question on his naval career. A response by Comdr. Lademan on October 6, 1966, defending his fitness report evaluation of plaintiff, commends the plaintiff’s industry, and criticizes his proneness to antagonize others, a weakness in which Comdr. Lademan had observed an im *718 provement. [Note that the plaintiff’s Selection Board met September 27 to November 10, 1966, and plaintiff’s explanation of September 11 and Lademan’s response of October 6 were not received by BuPers until October 11, so there is some question as to what opportunity the Selection Board had to see these communications before passing-over plaintiff. See finding 25, infra.]
(1) The only reference in plaintiff’s file of fitness reports to the subject of the Board proceeding was in the fitness report by Comdr. Drake for the period February 20, 1966-June 30,1966, in which the rating officer observed that “During a major part of this period Lt. Brenner has been affected by his prior participation in an investigation to which he was a party, and in which he feels apparently that he was done a grave injustice.”
24. Plaintiff was considered but not recommended for promotion to lieutenant-commander by a Selection Board which met from September 21 to October 22, 1965. This was not considered a “pass-over” on plaintiff’s record, since he was below-the-promotion-zone on that occasion.
25. A Selection Board for the recommendation of line officers of the Navy for temporary promotion to lieutenant-commander met from September 27 to November 10, 1966. The Board consisted of eight members and 14 alternate members, all of them captains. Junior officers were appointed as recorder and assistant recorders. The “precept” convening the Board gave a quota of 324 promotions to lieutenant-commander, with limits as to certain categories, and stated that “The fact that an eligible officer is above, within, or, below the promotion zone is immaterial to the determination of whether that officer meets the criteria established by law for his category.” However, a limit of 5 percent was imposed for promotion of officers below the promotion zone. (Whether this limit applied to the preceding Selection Board in 1965 in which plaintiff was below-the-zone as referred to in finding 24, is not disclosed by the record.) Eighty to 90 percent of the candidates before the 1966 Selection Board were recommended for promotion. Plaintiff was passed-over. A graduate of the Naval Academy would normally be given preference *719 by tbe Selection Board for promotion, all other things being equal, although this factor was not as influential as in prior years.
26. The next Selection Board for the lieutenant-commander promotion list met from October 3 to November 21,1967. It was composed of eight members and 14 alternate members, all captains. Its quota of promotions was 943. As in the case of the 1966 Board, a limit of 5 percent was imposed on the number of officers recommended for promotion who had been passed-over once before. The 1967 Board recommended 80 to 90 percent of the candidates for promotion. Plaintiff was again passed-over. Under 10 U.S.C. § 6382 a second pass-over for lieutenant-commander selection automatically results in separation the next succeeding June 30.
27. A Captain Meyer was an alternate member of plaintiff’s 1967 Selection Board. Meyer was known to plaintiff by reputation as an officer considered to be an authority in naval missiles and one who was familiar with the missile accident on the Luce because he had been involved in the investigation of the accident for BuWeapons. Plaintiff testified to his belief that Meyer either passed on his promotion candidacy at the 1967 Selection Board proceeding, or had been consulted by the members of that Board who did. By affidavit in the record Meyer conceded that he had participated in the investigation of the Luce accident, but denied having seen a copy of the report of the Board of Investigation concerning it, or having known of any consequences therefrom to plaintiff. While the accident was well known in the “missile Navy” circles, as an alternate member of the 1967 Selection Board, he denied having discussed the accident with the 1967 Selection Board members or the plaintiff’s connection with it, nor did he hear any mention of the accident in the course of the Selection Board proceedings. There is no evidence to the contrary. Moreover, Meyer was not a member of the 1966 Selection Board where the plaintiff alleges he was first passed-over due to the Selection Board’s knowledge of the missile accident, so Meyer as a source of such information would seem remote.
28. (a) Lt. Comdr. Saunders was a witness called by plaintiff. For the last 9 years of his naval service (until 1968) he *720 was bead oí tbe Fitness Report Branch, BuPers. He was in charge of 45 civilians who administered the Navy’s program of Officer Performance Evaluations. During that period he briefed every Navy Selection Board that met, that is, he explained the documents furnished them concerning the candidates for promotion on each list, primarily the fitness report file jacket and brief sheet which was a worksheet condensed from the fitness report file jacket, and instructed the Board how to use this material in their evaluation process. The file of each candidate for promotion was screened by Comdr. Saunders’ staff to insure that the record of fitness reports was complete. Each jacket would contain, in addition to the individual’s fitness reports, all letters of commendation, censure, disciplinary action, and “anything coming out of an investigation, any action, derogatory action, that resulted in an investigation would logically be reflected in the Selection Board jacket.” Fitness reports are of prime importance to the Selection Board to passing on promotions; the other contents of the file jacket are of secondary importance since the fitness reports should reflect anything of a derogatory nature, the specifics of which should be found elsewhere in the file jacket.
(b) Plaintiff’s second Selection Board (1967) would know that plaintiff had been passed-over by the first Board because of his “lineal position” on the roster of candidates, arranged according to dates of rank. Although the fact of having been passed-over by one Board should not influence the individual’s selection on his next Board, as a practical matter he is more likely than not to be passed-over by the second Board because the derogatory information in his file which caused the first pass-over is still in his file. Only a small percentage of officers with one pass-over succeed the second time.
(c) Plaintiff’s pass-over problem is somewhat unusual because there are not many officers on a promotion list who are subjects of an investigation in process but not completed at the time of Board action. The investigation of the missile mishap on the Luoe was technically completed February 23, 1968, so it was pending during both the 1966 and the 1967 Selection Board meetings.
29. (a) Comdr. Saunders has no recollection that either the 1966 or 1967 Selection Board asked him for a record of *721 the Board of Investigation, proceeding in January 1966 to which plaintiff had been made a Party. The only reference in plaintiff’s -fitness reports to his involvement in an investigation was the fitness report for the period February 20,1966-June 30,1966, which comments on plaintiff’s participation in an investigation (see finding 23(1), supra). Other references to plaintiff’s involvement in that proceeding which were in the documents before the Selection Boards were (1) the letter of October 2, 1967, by Admiral Belch in plaintiff’s behalf to the 1967 Selection Board (see finding 3(d), supra), and (2) the Security Termination Statement of February 17, 1966, which was in plaintiff’s personnel file before both Selection Boards (see finding 30, infra). Comdr. Saunders said that if a Selection Board member had noticed these references concerning plaintiff, he could have asked him (Comdr. Saunders) to produce the Board of Investigation record for the Board to examine in evaluating plaintiff’s candidacy for promotion. Since the plaintiff was issued a letter of censure in May 1966 and his first Selection Board convened in September 1966, Comdr. Saunders said “I would think that it was likely” that the Board had before it the letter of censure, since the investigation report is considered complete at the time the letter of censure is issued. Comdr. Saunders believed that a letter of instruction is normally made a matter of record for inclusion in the promotion candidate’s file jacket before the Selection Board, but he was not certain of that. If a letter of censure were in a candidate’s record before a Selection Board “Of course, it would have a derogatory inference as any critical or derogatory or low mark would have.” He stated further: “* * * There’s some question as to whether or not the [Selection] Board might have had knowledge about it [the Board of Investigation proceeding to which plaintiff was a Party] and you can’t pin this down. * * *”
(b) Comdr. Saunders had no recollection of being asked by the 1966 Selection Board for the Board of Investigation record concerning plaintiff. He recalls that in late 1966 or early 1967, after the 1966 Selection Board had passed-over plaintiff the first time, the plaintiff asked him if the Board had requested the production of the Board of Investigation *722 record concerning plaintiff, but be recalls no specifics. (Plaintiff testified that Comdr. Saunders had told him that the
1966 Selection Board had asked him (Comdr. Saunders) for the Board of Investigation record, but he had refused to provide it because the investigation was not at that time complete). Note that Comdr. Saunders considers such an investigation complete when a letter of censure is issued, apparently even when an appeal is pending, although his testimony was contradictory on this point. The fact that such a record was classified Secret would make no difference.
(c) According to Comdr. Saunders, Board of Investigation reports as to completed investigations involving a promotion candidate, deposited with JAG as a “matter of interest”, were routinely made available to Selection Boards. It is clear that JAG had on file at all times a complete copy of the Board of Investigation record, and also a letter of January 28, 1967, from Admiral Buckner referring to the fact that a letter of instruction had been issued to plaintiff.
30. A “Security Termination Statement” dated February 17, 1966 (at the conclusion of the Board of Investigation proceeding) was issued to plaintiff. It refers specifically to the Informal Board of Investigation to which plaintiff was a Party. This statement was available to plaintiff’s Selection Boards.
31. Although the correspondence record is incomplete, on the basis of the clues provided in the correspondence that is in the record, coupled with the testimony of Comdr. Saunders, it is reasonable to conclude that the 1966 Selection Board knew from references in the records known to be before it, that plaintiff had been a Party to an investigation. The 1967 Selection Board would have had more certain reason to demand the complete record of the Board of Investigation proceeding and its sequelae because Admiral Beioh’s letter to the
1967 Selection Board on plaintiff’s behalf (finding 3(d), supra), made specific reference to the fact. These conclusions are necessarily circumstantial because proceedings of Selection Boards are secret and not recorded.
32. On December 6,1967, after having been passed-over by the second Selection Board, and having been transferred to a Navy Sub-Board of Inspection and Survey at Newport Naval *723 Base, plaintiff requested an early discharge and a commission in the naval Reserve. Plaintiff was honorably discharged June 7,1968.
33. In response to a question by the trial commissioner in the course of trial, the plaintiff testified that if he were offered reinstatement in the Navy he would decline. His age, lengthy interruption of active duty, and the ineradicable blotting of his copy book would make his advancement too unlikely as a retread. He is now selling real estate.
34. From a complete absence of evidence to that effect, it is concluded that plaintiff never applied for relief to a Board for Correction of Naval Records.
35. There is no evidence that the two selection boards that failed to recommend the plaintiff for promotion considered any derogatory material or facts outside of his fitness reports, personnel file, and official record furnished to such boards in accordance with the provisions of the statutes and Bureau of Naval Personnel Manual.
CONCLUSION OE LAW
The court concludes as a matter of law upon the foregoing findings of fact, which are adopted by the court and made a part of the judgment herein, that the actions of the two selection boards in failing to recommend the plaintiff for promotion to the rank of lieutenant commander were neither arbitrary, capricious, nor contrary to law, and that the plaintiff is not entitled to recover active duty pay or retirement pay, and his petition is dismissed.

 In a related part of his opinion, the trial judge said: “The evidence In Brenner’s case is somewhat murky as to precisely what material his Selection Boards considered relating to his Board of Investigation participation and the subsequent censure, but the wide distribution of the damaging Board of Investigation record throughout the missile Navy, the deposit of the entire record and its sequelae with Navy JAG and submission of that record to BuPers for deposit in plaintiff’s official record as a ‘matter of interest’ at the direction of the admiral who had convened the Board of Investigation (although BuPers declined to retain the record after both of plaintiff’s successive Selection Boards had passed him over), [footnote omitted] produces the circumstantial but entirely reasonable conclusion that plaintiff’s Selection Boards were sufficiently imbued with derogatory data concerning the plaintiff’s Board of Investigation involvement to influence their judgment to the detriment of plaintiff’s chances for promotion to lieutenant-commander.’’

 No Navy directive, regulation, or authoritative statement has been presented to us -which states or implies that board members may consider any specific information about the officer which is not reflected in the record before them. The whole tenor of the statute-plus-reg-ulations is to the contrary.

 These two sentences are based on allegations In paragraphs 11 and 12 of the petition which defendant admitted In its answer. However, plaintiff's exhibit L, “Party’s Written Acknowledgement of Advice on Rights and Waivers Thereof” dated February 4, 1966, bears the typed signature of plaintiff witnessed by the typed signature of Capt. Upshaw, a member of the Board. It appears to be a conformed copy of an original and, if so, represents that plaintiff accepted his designation as a Party at a time when the admission in the pleadings has him at sea. The conflict is curious but not important

 Buckner found that four derelictions recommended by the Board were not supported by the record, and disapproved that portion of the Board recommendation.

 Despite his predicament, note in finding 3(b), supra, plaintiff was apparently performing well enough as weapons oflicer on the Luce to merit an indirect commendation by Admiral Ruckner for obtaining an Excellent rating for the Luce during its maneuvers on that cruise. Note also plaintiff’s fitness report for the period July 1 to November 28, 1966, which, along with pluses and minuses in plaintiff’s performance, quotes a chief inspector’s comment after the Luce had received an Excellent grade, that “The performance and positive attitude of the Weapons Officer [the plaintiff] is especially noteworthy and a prime factor in the ship’s high state of readiness.”

 As observed In finding 3(b), supra, plaintiff was preoccupied on November 22 and 23, 1966, in maneuvers on the Luce which won the ship an “K” rating from Admiral Ruckner, an accomplishment largely attributable to plaintiff’s functioning as weapons officer.

 Commander Lademan, whose promotion to captain had been approved by tbe Selection Board in tbe summer of 1966 (see finding 12, supra), would not be affected to tbe same extent as plaintiff by tbe deposit of tbe Board record in bis record as a matter of interest. Plaintiff was passed-over by tbe Selection Boards wbicb convened in 1966 and 1967 (see findings 25 and 26, infra). By “official record” it is assumed that Admiral Ruckner’s letter to JAG meant that be suggested that the Board record would be filed in plaintiff’s record in BuPers. There is no indication that a letter of instruction was issued to Lademan, or that tbe Board recommendation found him at fault re tbe missile accident, although be was a Party to tbe investigation and attended all sessions of tbe Board accompanied by counsel. Tbe Board record is not in evidence.

 Note that on the same day, January 28, 1967, Admiral Ruckner had recommended to JAG that It deposit the Board record In plaintiff’s official record as “a matter of interest,” and that JAG make Ruekner’s letter to JAG a part of the Board of Investigation record.

 It Is not known what system the Selection Board uses to analyze a promotion candidate’s fitness report. This analysis does not purport to reflect the individual's standing vis-a-vis other candidates whose respective fitness reports are not before us. It merely compares the individual’s point standing vis-a-vis a hypothetical median, which median is not intended to reflect the average fitness report standing of the roster of ofiicers before any Selection Board. It is a theoretical exercise. Cf. a comparable effort using numerical equivalents in analyzing fitness reports appearing in finding 13 of Norman v. United States, 183 Ct. Cl. 41, 392 F. 2d 255 (1968), cert. denied 393 U.S. 1018 (1969).

 Comdr. Lademan gave plaintiff a “Satisfied to have” rating under “Desirability”, which is next to the lowest rating available (“Prefer not to have”), although in the immediately preceding period Comdr. Lademan had rated plaintiff as “A very fine officer of great value to the service”, which is next to the highest rating available under the Desirability category. Since the lower rating of February 19, 1966, was made 2 days after the adjournment of the Board proceeding, it is concluded that it influenced the low rating, up until then this was the lowest rating the plaintiff had ever received.