**John DOE, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 04–90C.

United States Court of Federal Claims.

June 30, 2005.

---

John Doe, pro se, Plaintiff.

Gregory T. Jaeger, Esq., United States Department of Justice, Washington, D.C., for Defendant.

## MEMORANDUM OPINION AND FINAL ORDER

BRADEN, Judge.

On January 26, 2004, John Doe ("Plaintiff") filed this action in the United States Court of Federal Claims seeking compensatory and injunctive relief arising from a final decision of the United States Air Force ("Air Force") to retire Plaintiff because of a medical disability.[1]

The court's review of final decisions of the Armed Services is limited by well established United States Supreme Court and the United States Court of Appeals for the Federal Circuit precedent. *See, e.g., Dep't of Navy v. Egan,* 484 U.S. 518, 530, 108 S.Ct. 818, 98 L.Ed.2d 918 (1988) ("[U]nless Congress specifically has provided otherwise, courts traditionally have been reluctant to intrude upon the authority of the Executive in military [decisions.]"); *Gilligan v. Morgan,* 413 U.S. 1, 10, 93 S.Ct. 2440, 37 L.Ed.2d 407 (1973) ("[D]ecisions as to the composition, training, equipping, and control of a military force are essentially professional military judgments."); *see also Murphy v. United States,* 993 F.2d 871, 873 (Fed.Cir.1993) ("The court is not called upon to exercise any discretion

---

1. On February 15, 2005, the court placed the record in this case under seal. Accordingly, Plaintiff's name and certain factual information have been omitted for confidentiality reasons.

reserved for the military[.]"); *Sargisson v. United States*, 913 F.2d 918, 922 (Fed.Cir. 1990) (deciding not to review a decision to release surplus officers from active duty).

The United States Court of Appeals for the Federal Circuit has established a two-part test to assist the court in exercising its jurisdiction within these constraints:

> [First, the court must ascertain] 'whether the duty asserted can be judicially identified and its breach judicially determined, and [second] whether protection for the right asserted can be judicially molded....' We have emphasized that *judicial review* is only *appropriate where the Secretary's discretion is limited, and Congress has established 'tests and standards'* against which the court can measure his conduct.... Unless such a test or standard is provided, courts must abstain.

*Murphy*, 993 F.2d at 872–73 (emphasis added) (citations omitted).

Accordingly, in this case, the court has no authority to evaluate the merits of Plaintiff's contentions that: former President Clinton's Bosnian War strategy was influenced or appropriated from Plaintiff's Air Command and Staff College scholarship, without proper attribution; or the medical opinions that recommended Plaintiff's retirement for disability were superficial or inadequate. The court's jurisdiction "is [limited] solely [to] whether the [final] decision ... violated any statute, regulation, or the fundamental due process that the Constitution provides to all persons." *Holley v. United States*, 124 F.3d 1462, 1468 (Fed.Cir.1997).

As will be discussed in more detail herein, the court has determined that the Air Force did not violate any statute, regulation, or provision of the United States Constitution. Accordingly, as a matter of law, the court is required to grant Defendant's Motion for Judgment on the Administrative Record. As the Addendum indicates, however, this decision does not rest easy with the conscience of the court.

## RELEVANT FACTS AND PROCEDURAL BACKGROUND [2]

### A. Factual Background.

**1. Plaintiff's Service In The United States Army, United States Army Reserve, And United States Air Force In 1965–1997.**

In 1965, Plaintiff enlisted in the United States Army. *See* Def. Supp. Ex. at 4. After completing the military's foreign language school, Plaintiff was selected to attend the United States Military Academy Preparatory School and the United States Military Academy ("West Point"). *Id.* At West Point, Plaintiff studied nuclear physics and had an "outstanding [academic and professional] record." *See* Pl.App. at 38. Following graduation, Plaintiff served as a Platoon Leader for a missile battery in Europe, until he voluntarily was released from active duty in 1975. *See* Def. Supp. Ex. at 4.

From 1975 to 1978, Plaintiff attended law school. *Id.* Following graduation and admission to the bar, he served as an Administrative Law Judge from 1979 to 1981. *Id.* at 5; *see also* Pl.App. at 54. During that time, Plaintiff also participated in the United States Army Reserve until March 28, 1981, on or about the time he joined the United States Air Force ("Air Force") as a Judge Advocate General ("JAG") Officer. *See* Def. App. at 1; *see also* Def. Supp. Ex. at 5. In 1985, Plaintiff transferred to the Air Force's Acquisition and Contracting Department. *See* Def. Supp. Ex. at 5. Thereafter, Plaintiff successfully completed tours of duty at the Air Command and Staff College ("AWC"), where he was given an outstanding graduate award, and at the Defense Personnel Support

**2.** The relevant facts recited herein were derived from: the January 26, 2004 Complaint ("Compl."); the Defendant's ("Government") May 28, 2004 Motion for Judgment Upon the Administrative Record ("Gov't Mot. J. Admin. Rec.") and Appendix thereto ("Def.App."); Plaintiff's June 18, 2004 Opposition ("Pl.Opp."); the Government's July 30, 2004 Reply ("Gov't Reply"); Plaintiff's September 16, 2004 Motion for Rule 11 Sanctions ("Pl. Mot. for Sanctions"); the Government's October 20, 2004 Response thereto ("Gov't Resp.") and Supplemental Exhibit ("Def.Supp.Ex."); Transcript of April 6, 2005 Status Conference ("TR ___."); and Plaintiff's April 25, 2005 Motion for Partial Judgment Upon the Administrative Record ("Pl. Mot. Partial J. Admin. Rec.") and Appendix thereto ("Pl.App.").

Center. *Id.; see also* Compl. ¶ 75. On July 1, 1992, Plaintiff was promoted to the rank of Lieutenant Colonel. *See* Compl. ¶ 14. In 1996, while stationed at a Headquarters, Air Force Material Command, Plaintiff received a Letter of Admonishment regarding alleged sexual harassment charges that were filed during his three-month temporary assignment to Saudi Arabia. *See* Def. Supp. Ex. at 2, 5; Pl.App. at 5–6. With the exception of this reprimand, Plaintiff had an excellent record of service in the Air Force. *See* Def. Supp. Ex. at 4–5.

On July 16, 1997, shortly before being transferred to the 77th Communications Squadron, Plaintiff sent a hostile letter to former President Clinton complaining "that the strategies [the President] used in 1994 and 1995 to resolve the Bosnian situation came from [Plaintiff's AWC] research paper." *See* Def. Supp. Ex. at 1. After the White House staff received a second letter on February 18, 1998 to the same effect, the Air Force Liaison Officer contacted Plaintiff's supervisor and requested that Plaintiff undergo a "Command Directed [Mental Health] Evaluation" ("CDE").[3] *Id.; see also* Pl.App. at 4. On May 4, 1998 and August 17, 1998, Plaintiff was evaluated by the Element Chief at an Air Force Base's Mental Health Clinic. During these evaluations, Plaintiff advised the Element Chief that he was the subject of Biblical prophecy, was pursuing Russian resources to allow him to complete research on time travel theories, and indicated that he was unable to reconcile his grievances about the alleged use of his AWC research paper, without attribution. *See* Def. Supp. Ex. at 9–10. Plaintiff was diagnosed as having a "Delusional Disorder, Mixed Type, with prevalent Grandiose and Persecutory Themes." *See* Def. Supp. Ex. at 8. Thereafter, the Element Chief advised a Medical Evaluation

Board ("MEB")[4] that Plaintiff should be removed from active duty service. *See* Def. Supp. Ex. at 8, 10; *see also* Pl. Opp. at 4. Plaintiff objected and requested a second opinion. *See* Def. Supp. Ex. at 11. On October 8, 1998, Plaintiff was evaluated by another Air Force Base Mental Health Clinic. *Id.* On October 15, 1988, the Flight Commander of the second Air Force Mental Health Clinic issued a Narrative Summary that concurred with the Element Chief's diagnosis and recommendation to the MEB that Plaintiff be removed from service. *See* Def. Supp. Ex. at 12.

### 2. Medical Evaluation Board Proceeding In January 1999.

Sometime in early January 1999, the MEB President requested that additional medical testing be conducted prior to the entire Board convening. *See* Pl. Opp. ¶ 5. On January 13, 1999, a Psychiatric Resident prepared a Narrative Summary, wherein he diagnosed Plaintiff as a psychotic afflicted with delusional disorder. *See* Compl. ¶ 6; *see also* Def.App. at 61. Prior to finalizing and submitting this Narrative Summary, the Psychiatric Resident reviewed his diagnosis with a third Air Force Medical Center's "entire psychiatry staff," including the Program Director, who co-signed the final January 13, 1999 Narrative Summary. *See* Def.App. at 65. On January 28, 1999, the MEB issued a report referring this matter to an Informal Physical Evaluation Board ("IPEB"). *Id.* at 60.

### 3. Informal Physical Evaluation Board And Formal Physical Evaluation Board Proceedings In February–April 1999.

On February 14, 1999, Plaintiff submitted

---

3. In 1988, Plaintiff received a CDE after the Director of one of the National Laboratories reported to the Air Force Office of Special Investigations that Plaintiff requested use of the lab to confirm his theories on time travel. *See* Def. Supp. Ex. at 1. Plaintiff states that the lab misrepresented the situation and no further action was taken. *Id.*

4. The MEB consists of Air Force Medical Officers who evaluate a service member's medical history, recommend the disposition of the case, and

refer it to the final approving authority. *See* AFI 36–3212 § 2.2. Under the Air Force's Medical Examination and Standards Instruction, "[a]ny condition in the opinion of the provider of care [that] is felt to be unacceptable for continued military service is reason for performing a MEB for active duty [service members].... Questionable conditions should be addressed to the senior [medical] officer, and if required, to HQ AFPC/DPAMM[.]" AFI 48–123 Attachment 2.

a 23–page Letter of Exception to the IPEB [5] contesting the MEB's decision:

> That letter provided abundant documentary evidence and advanced arguments that [former] President Clinton borrowed ideas from Plaintiff's AWC paper to formulate his military strategy in Bosnia. That documentary evidence included a copy of Plaintiff's AWC research paper and AWC documents from the AWC faculty designating Plaintiff as [an] Outstanding Graduate among the colonels and lieutenant colonels in the 1994 AWC course. That evidence and those arguments ... later persuaded certified experts on military strategy ... that Plaintiff's claim against [former] President Clinton was true, despite their initial belief to the contrary.

Compl. ¶ 128.

On February 23, 1999, the IPEB recommended that Plaintiff "be permanently retired with a 30% compensable disability rating." *Id.* at 58–59.[6] On February 24, 1999, Plaintiff requested a "full and fair hearing," pursuant to 10 U.S.C. § 1214,[7] and filed a Letter of Exception contesting the Psychiatric Resident's January 13, 1999 Narrative Summary, the MEB recommendation, and the IPEB findings. *See* Compl. ¶¶ 8–11. Plaintiff's appeal of the IPEB's determination then was forwarded to a Formal Physical Evaluation Board ("FPEB").[8]

Prior to the FPEB's hearing, Plaintiff's appointed counsel requested that the Psychiatric Resident who issued the January 13, 1999 Narrative Summary be made available for cross-examination. *See* Compl. ¶¶ 14–15; *see also* Pl.App. at 15. On April 2, 1999, the FPEB President denied that request, but stated that if "the available medical information in [Plaintiff's] case is insufficient or inaccurate, then the Board will order additional medical consultants/opinions as appropriate." *See* Pl.App. at 67. During the April 9, 1999 FPEB hearing, Plaintiff's counsel objected to being denied the ability to cross-examine the Psychiatric Resident; however, Plaintiff testified and "provided evidence and advanced arguments that [former] President Clinton (1) borrowed ideas from Plaintiff's AWC paper to formulate his military strategy in Bosnia and (2) used the ideas from Plaintiff's March 31, 1999 letter to make changes in [former] President Clinton's ... military strategy for Kosovo." Compl. ¶ 131; *see also id.* ¶¶ 122, 125, 128, 132–137. On April 9, 1999, the FPEB issued a final decision concurring with the IPEB's recommendation that Plaintiff was unfit for further military service. *See* Def.App. at 56–57.

### 4. Secretary Of The Air Force Personnel Command Proceeding In April–May 1999.

On April 20, 1999, Plaintiff filed a timely appeal of the FPEB's April 9, 1999 final

---

**5.** AFI 36–3212 § 3.1 provides: "A [Physical Evaluation Board ("PEB")] is a fact-finding body that investigates the nature, origin, degree of impairment, and probable permanence of the physical or mental defect or condition of any member whose case it evaluates. The disability system provides for two PEBs: an Informal PEB and a Formal PEB. If either board finds a member unfit, it recommends appropriate disposition based on the degree of impairment caused by the disabling condition, the date incurred, and the member's line of duty status."

**6.** As part of the disability evaluation process, the Air Force assigns a percentage rating to a medical defect or condition when the member is physically unfit for duty. *See* AFI 36–3212 §§ 1.7, 1.9. Under Title X, the Air Force uses the Department of Veterans Affairs Schedule for Rating Disabilities ("VASRD") to quantify compensable disabilities. *Id.* 10 U.S.C. § 1201(b) authorizes the appropriate service Secretary to retire service members for disability if they have completed 20–years of service or they have a VASRD

disability rating of 30%. Plaintiff was eligible to be retired under either of these criteria.

**7.** 10 U.S.C. § 1214 provides: "No member of the armed forces may be retired or separated for physical disability without a full and fair hearing if he demands it."

**8.** Once an IPEB determines that a service member is unfit for continued military service, the member can request another hearing before a FPEB where the service member can challenge the MEB's recommendation again. *See* Physical Disability Evaluation, Dept. of Defense Instruction 1332.38 Encl. 3 at 19 (Nov. 14, 1996). Service members who contest the IPEB's fitness determination before a FPEB are provided with legal counsel and the opportunity to present evidence on their behalf and make a personal appearance. *See* Pl.App. at 134. Pursuant to Air Force regulations, a FPEB determination satisfies the statutory requirement for a "full and fair hearing." *See* AFI 36–3212 § 3.2; *see also* Pl. App. at 130.

decision to the Secretary of the Air Force Personnel Command ("SAFPC"). *See* Compl. ¶ 25. The Senior Legal Advisor to the SAFPC Director, however, concluded that Plaintiff "did not present any compelling arguments to support his contention [of lack of due process.]" Def.App. at 54; *see also* Comp. ¶ 26. On May 19, 1999, SAFPC issued a final decision affirming the FPEB's decision. *See* Def.App. at 54–55. On June 8, 1999, Air Force Personnel Command issued Special Order No. ACD–00882, pursuant to 10 U.S.C. § 1201(a),[9] setting Plaintiff's mandatory retirement date for August 19, 1999. *Id.* at 53. On August 19, 1999, Plaintiff was retired by the Air Force because of disability. *Id.* at 6.

### 5. Air Force Board For The Correction Of Military Records.

On December 15, 2000, Plaintiff properly petitioned the Air Force Board for the Correction of Military Records ("AFBCMR")[10] to correct his disability evaluation and associated military records "by revocation" of the FPEB's April 9, 1999 decision and restore him to active duty. *See* Compl. ¶ 33. In support, Plaintiff proffered a medical evaluation conducted on December 10, 1999 by a Department of Veterans Affairs ("VA") physician that concluded: "Currently, I am unable to confirm the diagnosis of delusional disorder. Through a series of retrospective connections and inferences it is possible that another evaluator might have made the diagnosis of a mental disorder but I cannot corroborate this at the current time." Def.App. at 72; *see also* Pl.App. at 48.

On February 23, 2001, AFBCMR forwarded Plaintiff copies of advisory opinions written by the AFBCMR's legal and medical advisors concluding that the Air Force provided Plaintiff with a "full and fair hearing" concerning the circumstances surrounding

his retirement. *See* Def.App. at 102–05; *see also* Compl. ¶¶ 34–35. AFBCMR's Legal Advisor also determined that the Air Force satisfied all applicable regulations. *See* Def. App. at 104–05. In addition, AFBCMR's Medical Officer concurred with the FPEB and distinguished the VA physician's December 10, 1999 evaluation in light of prior opinions issued by Air Force mental health personnel, particularly since the VA physician's analysis was based on a single meeting, without access to Plaintiff's military and medical records. *See* Def.App. at 102–03. On March 20, 2001, Plaintiff filed a Response. *See* Compl. ¶ 35. On June 3, 2001, the AFBCMR denied Plaintiff's petition, adopting the position of the aforementioned advisory opinions and concluding that "insufficient relevant evidence has been presented to demonstrate the existence of probable error or injustice." Def.App. at 1–3; *see also* Compl. ¶ 36.

On March 20, 2002, Plaintiff requested that the AFBCMR reconsider his petition for correction based on "new evidence," *i.e.*, that a former Secretary of the Treasury's wife telephoned Plaintiff to advise him that "President Clinton may very well have presented the ideas from Plaintiff's AWC paper to [the former Secretary] and the other National Security Council members on 6 February 1994 as a new unconventional military strategy for the conflict in Bosnia. That request also related information about several science fiction authors ... and [that certain Air Force officers] had revoked the adverse referral Officer Performance Report ('OPR') and replaced it with an outstanding OPR, and that long after Plaintiff had retired [these officers] arranged for Plaintiff to receive numerous awards and decorations, placed them in a brown package, and mailed the package to Plaintiff's last known address." Compl. ¶ 142. On May 2, 2002, the Director of the AFBCMR advised Plaintiff

---

9. 10 U.S.C. § 1201(a) provides: "Retirement.— Upon a determination by the Secretary concerned that a member [of a regular component of the armed forces] is unfit to perform the duties of the member's office, grade, rank, or rating because of physical disability incurred while entitled to basic pay ... the Secretary may retire the member, with retired pay computed under section 1401 of this title[.]"

10. The AFBCMR is comprised solely of civilian employees authorized by Congress to change any military record, when it is necessary to correct an error or remove an injustice. *See* 10 U.S.C. §§ 1552(a)(1), (2). The AFBCMR is the final administrative appeal level to correct service records. *See* Def.App. at 130; *see also Strickland v. United States*, 61 Fed.Cl. 443, 452 (2004).

that his request for reconsideration was rejected. *See* Def.App. at 129; *see also* Compl. ¶ 143. On July 9, 2003, the Director of the AFBCMR notified Plaintiff that the evidence submitted in another letter dated June 18, 2003 was not relevant and that all future submissions would be "filed without action." *See* Def.App. at 130.

## B. Procedural History.

On January 26, 2004, Plaintiff filed a timely Complaint in the United States Court of Federal Claims seeking compensation and injunctive relief arising from the Air Force's decision to retire him with a medical disability. *See* Compl. ¶¶ 1–5. The Complaint states five Causes of Action that are interrelated and often redundant.

The First Cause of Action alleged that the Air Force violated a series of constitutional,[11] statutory,[12] and regulatory rights.[13] *See* Compl. ¶¶ 6–53. As a result, the Air Force "unlawfully retired Plaintiff ... and has refused to correct his military records or afford any other administrative relief to which he is entitled." *Id.* ¶ 53.

The Second Cause of Action alleged that the Air Force engaged in a series of acts in "bad faith," including violating Plaintiff's "constitutional rights by depriving him of property and liberty without due process of law." *Id.* ¶ 66; *see also id.* ¶¶ 54–65, 67.

The Third Cause of Action alleged that the Air Force violated AFI 36–3212 § 3.17 (Presumption of Fitness) by the unlawful retirement of Plaintiff and refusal to correct his military records. *Id.* ¶¶ 68–103.

The Fourth Cause of Action alleged that the Air Force's decision not to accord "due weight" to the VA physician's December 10, 1999 examination rendered the AFBCMR decision "(1) arbitrary, capricious, or an abuse of discretion and (2) unsupported by substantial evidence" and therefore legally insufficient. *Id.* ¶¶ 118–119; *see also id.* ¶¶ 104–117, 120.

The Fifth Cause of Action alleged that the Air Force's "forced disability retirement of Plaintiff and denial of his application to the AFBCMR, Defendant's determinations, documents, and actions were (1) arbitrary, capricious, or an abuse of discretion, (2) unsupported by substantial evidence and not in accordance to law." *Id.* ¶ 197; *see also id.* ¶¶ 121–196, 198.

On May 28, 2004, the Government filed a Motion for Judgment on the Administrative Record, together with a Statement of Facts in Support Thereof. On June 18, 2004, Plaintiff filed a Brief in Opposition, together with a Counter Statement of Facts. On August 3, 2004, the Government filed a Reply. On August 17, 2004, Plaintiff filed a "Protest/Objection to Fraud Perpetrated In the Defendant's Reply to Plaintiff's Response to Defendant's Motion for Judgment Upon the Administrative Record." On September 9, 2004, the Government filed a Response. On September 14, 2004, Plaintiff filed a Reply. On September 16, 2004, Plaintiff filed a Mo-

---

**11.** The First Cause of Action alleged a violation of the Takings Clause of the Fifth Amendment. *See, e.g.,* Compl. ¶¶ 12–13, 15–16, 20–25, 35–37, 39, 45–52. A violation of the Due Process Clause of the Fifth Amendment is also asserted and a violation of the Confrontation Clause of the Sixth Amendment is implied. *Id.* ¶¶ 12, 14–25, 27, 29, 33, 35–37, 39, 52.

**12.** The First Cause of Action also alleged a violation of the following statutes: 10 U.S.C. § 633 (requiring 28 years of active commissioned service before retirement), *see, e.g.,* Compl. ¶¶ 2, 14; 10 U.S.C. § 1214 ("No member of the armed forces may be retired or separated for physical disability without a full and fair hearing if he demands it."), *see, e.g.,* Compl. ¶¶ 9–11, 22, 24, 29, 39–44, 52(a)-(f); 37 U.S.C. § 204 ("Pay and Allowances of the Uniformed Services"), *see, e.g.,*

Compl. ¶¶ 2, 14; 37 U.S.C. § 402 ("Basic Allowance for Subsistence"), *see, e.g.,* Compl. ¶¶ 2, 14, 46–51; 37 U.S.C. § 403 ("Basic Allowance for Housing"), *see, e.g.,* Compl. ¶¶ 2, 14, 46–51; 10 U.S.C. § 1074 ("Medical and Dental Care for Members and Certain Former Members"), *see, e.g.,* Compl. ¶¶ 2, 14, 46–51; 10 U.S.C. § 1552(a)(1) ("Secretary of a military department may correct any military record ... to correct or remove an injustice."). *See, e.g.,* Compl. ¶¶ 32, 53.

**13.** In addition, the First Cause of Action alleged violations of ¶ 3.2 of AFI 36–3212 (Legal Basis for Formal Hearings), *see, e.g.,* Compl. ¶¶ 10, 19–22, 24, 29, 31, 39, 52–53, and Terms–Attachment 1 (Full and Fair Hearings). *See, e.g.,* Compl. ¶¶ 10, 31, 35, 52–53.

tion for Rule 11 Sanctions. On October 20, 2004, the Government filed a Response.

On February 15, 2005, the court denied Plaintiff's Motion for Rule 11 Sanctions. In addition, on February 15, 2005, the court appointed *pro bono* counsel to represent Plaintiff and issued a 60–day stay of proceedings.[14] During an April 6, 2005 status conference, the court asked the parties to explore a potential settlement. On April 25, 2005, Plaintiff "discharged" appointed counsel informing the court that Plaintiff would not agree to any settlement unless one of the provisions mandated his return to service. Plaintiff's "discharge" was based on a misunderstanding about the nature of the April 6, 2005 status conference. Accordingly, the court has not acted on Plaintiff's unilateral "discharge." On that same day, Plaintiff filed a Motion for Partial Summary Judgment on the Administrative Record.

## DISCUSSION

### A. Jurisdiction.

The United States Court of Federal Claims has been authorized by Congress to "render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). In *United States v. Mitchell*, 445 U.S. 535, 538, 100 S.Ct. 1349, 63 L.Ed.2d 607 (1980), however, the United States Supreme Court held that the Tucker Act does not create any substantive right for monetary damages. Therefore, a plaintiff must identify and plead an independent contractual relationship, consti-

tutional provision, federal statute, and/or executive agency regulation that provides a substantive right to money damages in order for the court to have jurisdiction. *See Khan v. United States*, 201 F.3d 1375, 1377 (Fed. Cir.2000); *see also Fisher v. United States*, 402 F.3d 1167, 1173–74 (Fed.Cir.2005) (*en banc*) (emphasis in original) (recognizing that *United States v. White Mountain Apache Tribe*, 537 U.S. 465, 472–73, 123 S.Ct. 1126, 155 L.Ed.2d 40 (2003) articulated a new test that "demands a showing demonstrably lower .... It is enough that a statute creating a Tucker Act right be *reasonably amenable* to the damages ... a *fair inference* will do.").

Although the Tucker Act does not provide independent jurisdiction over claims for declaratory or injunctive relief, the court has authority to provide equitable relief if the action is collateral to a claim for monetary damages.[15] *See Brown v. United States*, 105 F.3d 621, 624 (Fed.Cir.1997) ("The Tucker Act does not provide independent jurisdiction over such claims for equitable relief."); *see also Passaro v. United States*, 774 F.2d 456, 459 (Fed.Cir.1985) ("Equity, to the extent that it can be administered by the [United States Court of Federal Claims], exists as an incident of general jurisdiction under the Tucker Act[.]").

The Complaint properly alleges a money mandating statute by invoking the Military Pay Act, 37 U.S.C. § 204, since that Act, in relevant part, provides: "a member of the uniform service who is on active duty ... [is] entitled to the basic pay of the pay grade to which assigned." 37 U.S.C. § 204; *see also Martinez v. United States*, 333 F.3d 1295, 1303 (Fed.Cir.2003) (*en banc*) ("In the context of military discharge cases, the applica-

---

**14.** The United States Court of Federal Claims maintains a list of attorneys experienced with Disability Appeals and Veterans Affairs regulations willing to provide *pro se* assistance to current and former members of the Armed Services who file lawsuits against the Government. Professor James T. O'Reilly of the University of Cincinnati College of Law, a member of the United States Court of Federal Claims *Pro Bono* Program and former Chairman of the American Bar Association's Section on Administrative Law and Regulatory Practice, was appointed by the court to serve as Counsel to Plaintiff.

**15.** 28 U.S.C. § 1491(a)(2) states: "To provide an entire remedy and to complete the relief afforded by the judgment, the court may, as an incident of and collateral to any such judgment, issue orders directing restoration to office or position, placement in appropriate duty or retirement status, and correction of applicable records, and such orders may be issued to any appropriate official of the United States."

ble 'money-mandating' statute that is generally invoked is the Military Pay Act, 37 U.S.C. § 204[.]"). The Complaint also properly alleges 26 U.S.C. § 1491(a) as a basis to review the correction of military records. *See Voge v. United States*, 844 F.2d 776, 781 (Fed.Cir.1988).

## B. Justiciability.

■ When legal challenges to final military decisions are raised, the court is obligated first to consider the justiciability of the legal question presented. *See Orloff v. Willoughby*, 345 U.S. 83, 93–94, 73 S.Ct. 534, 97 L.Ed. 842 (1953) ("[J]udges are not given the task of running the [military]. The responsibility for setting up channels through which such grievances can be considered and fairly settled rests upon the Congress and upon the President of the United States and his subordinates."); *see also Murphy v. United States*, 993 F.2d 871, 874 (Fed.Cir.1993) ("[J]udicial review is only appropriate where the Secretary [of the Air Force]'s discretion is limited, and Congress has established 'tests and standards' against which the court can measure his conduct."). The United States Court of Appeals for the Federal Circuit specifically has held that determining who is fit or unfit to serve in the armed forces does not fall within the judicial province. *See Heisig v. United States*, 719 F.2d 1153, 1156 (Fed.Cir. 1983) (holding that the merits of the military's decision to release a service member from active duty are non-justiciable).

■ Although the merits of a fitness to serve determination are non-justiciable, the United States Court of Appeals for the Federal Circuit nevertheless has recognized that the United States Court of Federal Claims has limited authority to adjudicate a constitutional challenge arising from a procedure used by the Armed Forces. *See Adkins v. United States*, 68 F.3d 1317, 1323 (Fed.Cir. 1995) (emphasis in original) ("[A]lthough the *merits* of a decision committed wholly to the discretion of the military are not subject to judicial review, a challenge to the particular *procedure* followed in rendering a military decision may present a justiciable controversy."); *see also Murphy*, 993 F.2d at 873 ("When the military is given unlimited dis-

cretion by Congress, it is nevertheless bound to follow its own procedural regulations if it chooses to implement some."). Therefore, when the Armed Forces have issued a final decision, the court can intervene only to ensure that the decision was made in a proper procedural manner. *See Wagner v. United States*, 365 F.3d 1358, 1361 (Fed.Cir.2004) ("[W]e will not disturb the decision of the corrections board unless it is arbitrary, capricious, contrary to law, or unsupported by substantial evidence."); *see also Carmichael v. United States*, 298 F.3d 1367, 1373–74 (Fed.Cir.2002) ("If the Navy failed to follow its own policies and did not properly provide [plaintiff] with religious accommodation procedures, [plaintiff's] discharge may be involuntary because he was faced with the untenable option[.]"); *Voge*, 844 F.2d at 779 ("Though the question of fitness to serve may be nonjusticiable in various contexts, we have consistently noted that a challenge to a particular procedure followed by the military in rendering a decision may present a justiciable issue."); *Murphy*, 993 F.2d at 873–74 (holding that the United States Court of Federal Claims may decide whether the military followed procedures set forth in its own regulations).

## C. Standard Of Review For Final Decisions In Military Cases.

This case presents a justiciable controversy since the Military Pay Act provides monetary damages, and the standards by which the court measures the Air Force's procedures are defined by the APA, which provides that substantive standard under which final actions may be subject to review by the United States Court of Federal Claims, *i.e.*, "whether the ... action was arbitrary, capricious, or in bad faith, or unsupported by substantial evidence, or contrary to law, regulation or mandatory published procedure of a substantive nature by which [the complainant] has been seriously prejudiced.... The standard in these cases is broadly referred to as the 'substantial evidence' rule." *Heisig*, 719 F.2d at 1156; *see also Voge*, 844 F.2d at 779 ("[T]he [United States Court of Federal] Claims ... may review the [challenged] process for compliance with established proce-

dures."); *Clayton v. United States*, 225 Ct.Cl. 593, 594, 1980 WL 13179 (1980) ("Since there is a strong presumption that the AFBCMR faithfully discharged their duties, plaintiff has the burden of proving otherwise.").

As a matter of law, the court's review of the SAFPC's May 19, 1999 final decision not to overturn the FPEB's April 9, 1999 final decision that Plaintiff was unfit for continued military service and its issuance of Special Order No. ACD–00882 mandating Plaintiff's military retirement for a medical disability is limited to determining whether that final action was "arbitrary, capricious, or in bad faith, or unsupported by substantial evidence, or contrary to law, regulation, or mandatory published procedure." *See Fisher*, 402 F.3d at 1180 ("[E]ligibility for disability retirement pay ... is conducted under a deferential standard of review[.]"). Likewise, the court's review of the AFBCMR's June 3, 2001 final decision not to correct Plaintiff's disability evaluation and associated military records by revoking the FPEB's April 9, 1999 final decision and the SAFPC's May 19, 1999 final decision is limited to procedural compliance, not the underlying merits. *See Chappell v. Wallace*, 462 U.S. 296, 303, 103 S.Ct. 2362, 76 L.Ed.2d 586 (1983) ("[Military correction board] decisions are subject to judicial review [by the federal courts] and can be set aside if they are arbitrary, capricious, and not based on substantial evidence.").

## D. Judgment On The Administrative Record.

The standard of review for a Motion for Judgment on the Administrative Record, pursuant to RCFC 56.1, is similar but not identical to a motion under RCFC 56 for summary judgment. *See Bannum, Inc. v. United States*, 404 F.3d 1346, 1355 (Fed.Cir. 2005). The inquiry on a motion for summary judgment is whether the moving party has proved its case as a matter of fact and law or whether a genuine issue of material fact precludes judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In contrast, the standard of review on a Motion for Judgment on the Administrative Record is narrower,

*i.e.*, given all the disputed and undisputed facts, whether the plaintiff has met the burden of proof to show that the decision was not in accordance with the law. *See Bannum*, 404 F.3d at 1357 (instructing the court to make "factual findings under RCFC 56.1 from the [limited] record evidence as if it were conducting a trial on the record."). In the case of a final military decision, the review of the Administrative Record further is limited to determining whether applicable procedures were followed or not and is supported by "substantial evidence." *See Heisig*, 719 F.2d at 1156 ("[C]ourts cannot substitute their judgment for that of the military departments when reasonable minds could reach differing conclusions on the same evidence."). Specifically, the court may not retry the case on the merits. *Id.* at 1157.

## E. The Court's Resolution Of The Issues In This Case.

### 1. The SAFPC's May 19, 1999 And AFBCMR's June 3, 2001 Final Decisions Were Supported By Substantial Evidence.

The First and Fifth Causes of Action allege that the SAFPC's May 19, 1999 final decision to retire Plaintiff and AFBCMR's June 3, 2001 final decision to deny Plaintiff's request to revoke his August 19, 1999 involuntary disability retirement were arbitrary, capricious, an abuse of discretion, and unsupported by substantial evidence. *See, e.g.,* Compl. ¶¶ 10, 19–22, 24, 29, 31, 39, 52–53; *see also* Compl. ¶¶ 121–198. The Complaint also alleges that the records and proceedings leading to Plaintiff's disability retirement were in error, unjust, and should be deleted from his Air Force service record. *See, e.g.,* Compl. ¶¶ 2–4; *see also* Def.App. at 1. The linchpin to these claims is the allegation that the Psychiatric Resident's diagnosis and January 13, 1999 Narrative Summary were contrary to and directly confronted by evidence that Plaintiff provided to the multiple evaluation boards through personal testimony, affidavits, and legal briefs. *See, e.g.,* Compl. ¶¶ 9–11, 22, 24, 29, 39–44; *see also* Def.App. at 1, 13–45. The Air Force, however, never prohibited Plaintiff from introducing inde-

pendent and contrary medical testimony at any of these proceedings. *See* Compl. ¶¶ 18–19; *see also* Def.App. at 6, 9–45, 74–75, 107–126, and 127. Indeed, if Plaintiff had done so, the President of the FPEB indicated that he would have requested further evaluation. *See* Def. App at 67. Plaintiff, however, failed to do so. Plaintiff never supplied the MEB, IPEB, FPEB, or SAFPC with any independent medical evidence to contradict the diagnosis of the Psychiatric Resident or the January 13, 1999 Narrative Summary.

Although AFBCMR was provided with an evaluation conducted by a VA physician, that evaluation was qualified since the VA physician did not have access to Plaintiff's prior meetings or medical records. *See* Def.App. at 4, 54. AFBCMR not only considered the unanimous findings of the MEB, IPEB, FPEB, and SAFPC, but also requested a separate advisory opinion of a Chief Medical Consultant from the Air Force Personnel Command's Physical Disability Division ("AFPC/DPPD"), who independently reviewed Plaintiff's medical records, VA physician evaluation, pleadings, and prior testimony submitted by Plaintiff. *See* Def.App. at 2–3. AFBCMR concluded that "after a thorough review of [Plaintiff's] submission and his medical records, we are not persuaded by the evidence provided that he was improperly evaluated and that the information considered by the various medical boards was erroneous or inaccurate." *Id.* at 3–4.

The record evidences that all five separate tribunals that considered Plaintiff's fitness to continue to serve in the Air Force were supported by substantial evidence and their discretion properly was exercised pursuant to applicable federal statutes, Department of Defense regulations, and Air Force instructions. Therefore, the court has determined that the SAFPC's May 19, 1999 final decision and AFBCMR's June 3, 2001 final decision not to revoke the FPEB's recommendation to retire Plaintiff due to disability were supported by substantial evidence.

**2. Other Statutory And/Or Regulatory Related Claims Alleged Do Not Evidence Error By The MEB, IPEB, FPEB, SAFPC, And/Or AFBCMR.**

 The Complaint also recited other statutory and/or regulatory related claims that require only brief comment. First, the Complaint seeks "bad faith" damages because the Air Force failed to allow Plaintiff to cross-examine the Psychiatric Resident. *See* Compl. ¶¶ 54–67 (Second Cause of Action). The FPEB President's denial of Plaintiff's request, however, was well within the Board's discretion, as set forth in the Air Force Physical Evaluation for Retention, Retirement, and Separation Instruction, AFI 36–3212. Section 3.48 therein provides: "HQ AFPC/DPPD will establish and provide to HQ AFPC/DFFDF the formal hearing format and procedures." Pl.App. at 133. Since the Air Force Personnel Command has not established any formal guidance concerning FPEB procedure, issues regarding what witnesses are competent to testify and the scope thereof have been left to the discretion of the FPEB President. *See Gilligan v. Morgan*, 413 U.S. 1, 10, 93 S.Ct. 2440, 37 L.Ed.2d 407 (1973) (lacking any specific regulation "[t]he complex, subtle and professional decisions as to the composition, training, equipping and control of a military force are essentially professional military judgments."). Therefore, the Administrative Record does not support Plaintiff's allegations of bad faith. Moreover, Congress granted the Secretaries of the Armed Forces broad discretion to administer the military. Although the Air Force instructions do not specifically address the ability to cross-examine any witness, Plaintiff did not provide any evidence to overcome "the strong, but rebuttable, presumption that administrators of the military, like other public officers, discharge their duties correctly, lawfully, and in good faith." *Sanders v. United States*, 219 Ct.Cl. 285, 594 F.2d 804, 813 (1979); *see also* 10 U.S.C. § 1216.[16]

Second, the Third Cause of Action alleged that the medical evidence presented during the entire disability evaluation process never overcame the "presumption of fitness," estab-

---

**16.** 10 U.S.C. § 1216 provides: "The Secretary [of the Air Force] has all powers, functions, and duties incident to the determination under this chapter of—(1) the fitness for active duty of any member of an armed force under his jurisdiction[.]"

lished in AFI 36–3212 at § 3.17.[17] *See* Compl. ¶¶ 68–103. The Administrative Record, however, evidenced that the "presumption of fitness" was overcome in this case by the diagnosis of several physicians that Plaintiff had a disability that precluded further service in the Air Force. *See* Def.App. at 65; *see also* Def. Supp. Ex. at 9–12. Therefore, as a matter of law, it is not relevant if Plaintiff may have been able to perform his duties for the twelve month period prior to his retirement, a matter not contested in the Administrative Record.

The Fourth Cause of Action also alleged that "due weight" was not afforded the VA physician's December 10, 1999 examination that rendered the AFBCMR decision unsupported by substantial evidence. As previously discussed, the VA physician's December 10, 1999 evaluation was qualified and the record evidences that the evaluation was considered by the AFBCMR. *See* Def.App. at 2–3.

### 3. The Complaint Fails To Allege A Violation Of Plaintiff's Constitutional Rights In This Case.

The First, Second, and Fifth Causes of Action allege violations of Plaintiff's constitutional rights. As discussed herein, none of these claims are applicable in this case.

#### a. The Confrontation Clause Of The Sixth Amendment To The United States Constitution Is Not Applicable In This Case.

■ The Confrontation Clause of the Sixth Amendment to the United States Constitution provides that in all criminal cases the accused shall enjoy the right to be confronted by adverse witnesses. *See Delaware v.*

*Van Arsdall,* 475 U.S. 673, 680, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986) ("We think that a criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby 'to expose to the jury the facts from which jurors ... could appropriately draw inferences relating to the reliability of the witness.' "). In this case, to invoke the Confrontation Clause to compel the testimony of the Psychiatric Resident, Plaintiff would have had to be separated from the service with a "Dismissal" adjudged as part of a federal criminal conviction from a General Court–Martial. *See* Manual for Courts–Martial, Rule 1003(b)(8)(A).[18]

Plaintiff cites *Greene v. McElroy,* 360 U.S. 474, 493, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1959) and *Bland v. Connally,* 293 F.2d 852, 856–57 (D.C.Cir.1961) to support his claim that the United States Constitution gives him a right to cross-examine the Psychiatric Resident who wrote the January 13, 1999 Narrative Summary used during the disability retirement process. *See* Pl. Mot. Partial J. Admin. Rec. at 23–24 ("Plaintiff and the FPEB had 'no safeguard for testing by cross-examination' the statements of these absent witnesses to 'uncover inconsistencies, lapses in recollection, and bias[.]' "); *see also* Compl. ¶ 12. Plaintiff's argument, however, ignores a fundamental distinction between these cases and his own. In both cases, the individuals challenging the Department of Defense and Secretary of the Navy's administrative decisions were denied the opportunity to cross-examine unidentified accusers who provided direct oral testimony to the review boards. *See, e.g., Greene,* 360 U.S. at 493, 79 S.Ct. 1400 (holding that the Department of

---

17. AFI 36–3212 at § 3.17 provides: "Presumption of Fitness. The PEBs will presume a member fit if he or she has been able to do his or her duty satisfactorily in the 12 months before a scheduled retirement.... The presumption of fitness may be overcome in the following circumstances: 3.17.1. Within the presumptive period an acute, grave illness or injury occurs that would prevent the member from performing further duty if he or she were not retiring[.]" Def. App. at 131.

18. Dismissal is the only type of punitive discharge applicable to military officers and is equivalent to either a Dishonorable or Bad Conduct Discharge. *See* RCM 1003(b)(8)(A). Dishonorable Discharges are reserved for enlisted service members convicted of offenses that are usually recognized as felonies in civilian jurisdictions. *See* RCM 1003(b)(8)(B). A Bad–Conduct Discharge is punishment for conduct of either a civilian or military nature that does not rise to the level of a Dishonorable Discharge. *See* RCM 1003(b)(8)(C).

Defense's security clearance program, under which affected persons may lose their civilian jobs if they are found unfit to hold a clearance, violated the traditional procedural safeguards of confrontation and cross-examination); *Bland,* 293 F.2d at 856–57 (holding that the Secretary of Navy did not have authority to issue a Other Than Honorable discharge to a reservist for alleged criminal conduct engaged in during inactive status, without permitting reservist to confront the Government's witnesses even in an administrative hearing). In this case, Plaintiff was retired with a medical disability. Therefore, the Confrontation Clause did not attach to proceedings before the MEB, IPEB, FPEB, SAFPC, or AFBCMR—in this case the right to cross-examine the Psychiatric Resident regarding the January 13, 1999 Narrative Summary.

### b. The Due Process Clause Of The Fifth Amendment To The United States Constitution Was Not Violated In This Case.

■ In addition, the Complaint alleges that Plaintiff's counsel's inability to cross-examine the Psychiatric Resident during proceedings before the MEB, IPEB, FPEB, SAFPC, or AFBCMR also violated the Due Process Clause of the Fifth Amendment to the United States Constitution. *See, e.g.,* Compl. ¶¶ 1–2, 6, 76, 105, 112, 116, 118, 137, 141. Plaintiff contends such cross-examination was essential since all of the Air Force's subsequent actions resulting in his retirement were rendered based on the FPEB's decision that Plaintiff was no longer fit for military service. *Id.* As previously explained, Plaintiff has no right in this case to compel the testimony or to cross-examine any witness. In light of the five tribunals that afforded Plaintiff a hearing, including the submission of pleadings and live testimony from Plaintiff, the court has determined that Plaintiff had "due process" in this case.

■ The Complaint also alleges that Plaintiff's disability retirement deprived him of the right to liberty under the Due Process Clause of the Fifth Amendment to the United States Constitution, because of the stigma associated with his retirement rises to the level of a punitive discharge. *See* Compl. ¶ 13.

Only a Dismissal, Dishonorable, Bad Conduct, or Other Than Honorable Discharge can qualify as types of military separations that limit Fifth Amendment liberty interests, because they may prevent a discharged person from qualifying for certain types of employment, receiving federal benefits, or voting in federal and state elections. *See* 38 U.S.C. § 5303; *see also* 10 U.S.C. § 1553; 42 U.S.C.1973gg–6(g)(1). In this case, Plaintiff's retirement, even for disability, signifies only the successful completion of twenty or more years of Honorable Service.[19] Therefore, the Air Force's decision to retire Plaintiff for disability did not deprive Plaintiff of a liberty interest in any future civilian employment or any other capacity. *See* TR at 32 ("I sincerely doubt these employees are seeing his DD Form 214 that says retired for mental disability. It probably just says retired with an honorable discharge and amended.").

### c. The Takings Clause Of The Fifth Amendment To The United States Constitution Is Not Applicable In This Case.

■ In addition, the Complaint alleges a violation of the Takings Clause of the Fifth Amendment to the United States Constitution. It is well settled that in order to bring such a claim under the Fifth Amendment,[20] a plaintiff must have a private property interest at the time of the alleged taking. As the United States Supreme Court restated in an unanimous opinion less than a week ago in *Lingle v. Chevron U.S.A., Inc.,* —— U.S. ——, 125 S.Ct. 2074, 161 L.Ed.2d 876 (2005):

**19.** In cases of retirement for combat injury or service-incurred disability prior to reaching the statutory 20 year mark, service members are granted the same privileges as those who completed their required service. *See* 10 U.S.C. § 1201(b).

**20.** The Fifth Amendment to the United States Constitution provides that no person shall be "deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use without just compensation." U.S. CONST. amend. V, cl. 4.

**178**

The Takings Clause of the Fifth Amendment ... 'does not prohibit the taking of private property, but instead places a condition on the exercise of that power.' In other words, it 'is designed not to limit the governmental interference with property rights *per se*, but rather to secure *compensation* in the event of otherwise proper interference amounting to a taking.' .... The paradigmatic taking requiring just compensation is a direct government appropriation or physical invasion of private property.

*Id.* at 2080–81 (emphasis in original) (citations omitted); *see also Cienega Gardens v. United States*, 331 F.3d 1319, 1328 (Fed.Cir. 2003) ("[T]he complaining party must show it owned a distinct property interest at the time it was allegedly taken[.]").

■ The Complaint alleges that 10 U.S.C. § 633 creates a vested property right affording Plaintiff the right to continue serving in the Air Force until he reaches 28 years of service. *See* Compl. ¶ 14. Plaintiff has misread this statute.[21] As a matter of law, it is well settled that employment as a military officer is not a vested property interest. *See Norman v. United States*, 183 Ct.Cl. 41, 392 F.2d 255, 259 (1968) ("The principle is well established that there is no vested right to Federal employment or to the privileges of retirement thereby."); *see also Paskert v. United States*, 20 Cl.Ct. 65, 77 (1990) ("[S]ervice members have no right to remain on active duty, and their rights are defined by the applicable statutes and regulations."). Title X only codifies the maximum years of service that a military officer must accrue prior to reaching mandatory retirement. *See* 10 U.S.C. §§ 630–636.

In this case, although the Air Force utilized Plaintiff's high year tenure date for administrative and retirement planning purposes, the Air Force was not obligated to allow Plaintiff to continue to serve until that date. In fact, 10 U.S.C. § 633 specifically states that it only applies if the service member has not been retired. Congress has authorized the military to retire members determined unfit to perform the duties of their office, grade, rank, or rating because of physical disability regardless of length of service. *See* 10 U.S.C. § 1201(a). Therefore, the Secretary of the Air Force had legal authority to retire Plaintiff due to his physical disability, based on the FPEB determination that Plaintiff was no longer fit to perform the duties of his office. *Id.*

## CONCLUSION

For these reasons, the Government's May 28, 2004 Motion for Judgment Upon the Administrative Record is granted and the January 26, 2004 Complaint is dismissed.

**IT IS SO ORDERED.**

## ADDENDUM:

After graduating from West Point, Plaintiff devoted his adult life in the service of our country. The stress of extended duty, particularly abroad, today is recognized as a major threat to the health of military service members. *See* Matthew J. Friedman, *Posttraumatic Stress Disorder: An Overview, A National Center for PTSD Fact Sheet, United States Department of Veterans Affairs* at http://www.ncptsd.va.gov/facts/general/fs_overview.html. Plaintiff was not immune from the effects of that extended stress. And, as a result, he was retired involuntarily. *See What is Posttraumatic Stress Disorder, A National Center for PTSD Fact Sheet, United States Department of Veterans Affairs* at http://www.ncptsd.va.gov/facts/general/fs_what_is_ptsd.html ("It is generally thought that the best way to diagnose PTSD-or any psychiatric disorder ... is to combine findings from structured interviews and questionnaires with physiological assessments. A multi-method approach especially helps address concerns that some patients might be either denying or exaggerating their symptoms.").

---

**21.** 10 U.S.C. § 633 provides: "[E]ach officer of the Regular Army, Regular Air Force, or Regular Marine Corps who holds the regular grade of lieutenant colonel, and each officer of the Regular Navy who holds the regular grade of commander, who is not on a list of officers recommended for promotion to the regular grade of colonel or captain, respectively, shall, *if not earlier retired*, be retired on the first day of the month after the month in which he completes 28 years of active commissioned service." (emphasis added).

The record in this case is clear that Plaintiff did not have the benefit of a "multi-method approach" or drug therapy. Therefore, Plaintiff does not appreciate that even if he is absolutely correct that former President Clinton may have utilized strategy from Plaintiff's AWC research paper, without proper attribution, the means and manner in which Plaintiff chose to express that concern and his perception about those events adversely affected his continued ability to serve as an officer in the Air Force. We now know that PTSD also often "is associated with the increased likelihood of co-occurring psychiatric disorders [and][i]n a large-scale study, 88 percent of men … with PTSD met criteria for another psychiatric disorder." *Id.* at 3. The record in this case is also clear that the Air Force did not afford Plaintiff "a variety of forms of psycho-therapy and drug therapy [even though] some treatments appear quite promising." *Id.* at 4. Although the court has no authority to address that situation, if Plaintiff had been able to pursue those options, perhaps this case could have been avoided.

The court is confident that Plaintiff understands that he may now avail himself of this assistance through the VA. The circumstances surrounding Plaintiff's retirement may make this option akin to tearing a scab off an unhealed wound. Plaintiff, however, has exhibited intellect, courage, and tenacity in the past and in this proceeding. Therefore, the court urges Plaintiff once again to call on those resources and reconsider allowing the VA professionals to conduct a thorough medical analysis of all the circumstances surrounding his retirement and help him work toward achieving much needed closure and renewal. Although the court does not have authority to afford Plaintiff a full measure of "justice," VA medical professionals are capable of doing so and should be given that opportunity. Plaintiff has a great deal of knowledge in the critical field of physics and talent that can be brought to bear in starting a new and even more productive chapter in his life. The court respectfully requests that Plaintiff undertake that initiative.[22]

---

22. Professor O'Reilly continues to be available to work with Plaintiff to achieve this objective. In the alternative, at the court's request, Ronald B. Abrams, Joint Executive Director, National Veterans Legal Services Program, Washington, D.C., stands ready and willing to afford Plaintiff access to local resources to facilitate interface with VA medical and other professionals towards this objective. At the conclusion of the process, it may be possible for Plaintiff to re-approach the AFBCMR, with counsel, to ascertain what options for reconsideration and correction may be available. Again, the court respectfully requests Plaintiff to work with VA professionals and outside counsel to explore that option at the appropriate time.